664 So.2d 1016 (1995)
FLORIDA BIRTH RELATED NEUROLOGICAL, etc., Appellant,
v.
FLORIDA DIVISION OF ADMINISTRATIVE HEARINGS, etc., et al., Appellee.
No. 94-2368.
District Court of Appeal of Florida, Fifth District.
October 20, 1995.
Order Denying Rehearing December 15, 1995.
*1017 Samuel P. Bell, III, of Cobb, Cole and Bell, and W. Douglas Moody, Jr., of Taylor, Brion, Buker & Greene, Tallahassee, for Appellant.
Christopher L. Nuland, Florida Medical Association, Jacksonville, for Amicus Curiae, Florida Medical Association, Inc.
Larry Sands, of Sands, White & Sands, P.A., Daytona Beach, for Appellees.
HARRIS, Judge.
The issue on appeal is whether the hearing officer erred in his construction and application of the definition of a "birth-related neurological injury" as provided in section 766.302(2), Florida Statutes.
Eric Ryan Birnie (Eric) was born to Judith and Fred Birnie (the Birnies) on March 12, 1989 at Halifax Hospital in Daytona Beach. As a result of birth related events causing oxygen deprivation, Eric suffered a focal injury to the basal ganglia, an area of the brain which aids the body in performing "physical functions." The physician delivering obstetrical services during the birth of Eric was a "participating physician" with the Florida Birth-Related Neurological Injury Compensation Plan (the Plan).
The Birnies filed a petition for compensation for a birth-related neurological injury which was denied by the Florida Birth-Related Neurological Injury Compensation Association (NICA) based on its conclusion that Eric had not suffered an injury covered by section 766.302(2), Florida Statutes (1991) because he was not "substantially mentally impaired." An administrative hearing was held to determine whether Eric's injury was covered by the Plan.[1]
After hearing the evidence, the hearing officer rendered his decision finding that Eric had suffered a birth-related neurological injury and granted the Birnies' petition for compensation under the Plan. He specifically found that during the delivery, Eric had suffered "perinatal asphyxia ... hypoxic ischemia encephalopathy," the loss of oxygen to the brain. Additional findings of fact were included in the final order, the relevant portions of which are quoted here:
24. After Eric was discharged from the hospital, he was evaluated by Dr. James Nealis, a pediatric neurologist. Dr. Nealis first evaluated Eric on March 29, 1989. Under his direction, a number of tests and evaluations were conducted. A Genetics test did not reveal any abnormalities. Similarly, a urine metabolic screen and thyroid function study did not reveal any problems.
* * * * * *
27. An examination of Eric on January 11, 1990, indicated that he was experiencing some developmental delay. He had poor control of his head and he could not sit alone.
28. Eric began a special program at Easter Seals at approximately 11 months of age. At the time, Eric's gross motor skills were evaluated at 4 months and his fine motor skills were thought to be 4 1/2 months. At 16 months of age, Eric's motor development was still at 4 months. He could not sit alone and could not crawl.
* * * * * *

*1018 30. On August 1, 1990, Eric was evaluated at the Nemours Children's Clinic in Jacksonville, Florida. Dr. William R. Turk performed the evaluation. He noted that Eric's gross motor development was severely limited and concluded that Eric had a static but evolving encephalopathy.
* * * * * *
32. Dr. Turk summarized his findings in a letter to Eric's pediatrician dated September 25, 1990. That letter indicates that Dr. Turk reviewed Eric's "sequential neuroadiologic studies" and concludes that Eric has "a static encephalopathy manifest[ed] by a dystonic quadriplegia" as the result of "an evolving but remote hypoxic ischemic insult."
* * * * * *
35. In his 35 month evaluation conducted by Easter Seals, it was noted that Eric was functioning at an age equivalent of 8 months in gross motor skills. Eric was approximately age equivalent in receptive language skills, but he was functioning at only 24 months in expressive language skills. Eric was also demonstrating significant delay in oral motor skills. He had limited tongue mobility and was unable to lateralize, raise or lower his tongue. He was only able to produce a small number of vowel and consonant sounds.
36. On February 10, 1993, the Volusia County School Board administered a number of tests to Eric in order to evaluate him for placement in their exceptional student program. At the time of the evaluation, Eric was not able to stand, his manual dexterity was limited and special effort and attention was necessary to understand his verbal communications. Because of Eric's profound physical handicaps, the tests were specially selected and administered. The test results indicated that Eric was average or even above in his cognitive skills and preacademic skills. As a result, the School Board anticipates that Eric will ultimately be educated in a mainstream classroom with nonhandicapped students of his own age group. He will, however, need special accommodations within the classroom to address his physical handicaps and limitations.
37. The evidence established that it is very difficult to accurately assess the intellectual ability of a young child, especially a severely handicapped child such as Eric. While it is impossible to determine whether Eric's intellectual test results would have been higher if he had not suffered an hypoxic insult at birth, it is likely that the limitations on his exploratory capabilities caused by his physical handicaps have impaired his intellectual development to some degree.
38. At the time of the hearing in this case, Eric was 4 1/2 years old. He was unable to stand up, walk or crawl. His only method of independent mobility was to roll over. The use of his hands and arms was very limited. He also had great difficulty talking and/or communicating and he must take long pauses to formulate a response to any inquiry.
39. Eric's brain dysfunction is permanent. Because Eric's speech is greatly impacted by his condition, it is virtually certain that he will always be severely limited in his verbal expression and other communication skills. While continued therapy may help him to communicate better and to become somewhat more mobile, he will almost certainly never be able to walk, feed, groom or toilet himself.
40. The evidence established that Eric's problems are the result of damage to the basal ganglia deep inside his brain. Although it can not be determined conclusively, it is more likely than not that the "white matter" surrounding the basal ganglia have also been damaged to some degree which may impact his perceptual and processing abilities.
* * * * * *
43... . Eric sustained an injury to the brain caused by oxygen deprivation in the course of labor, delivery or resuscitation in the immediate post-delivery period. The injuries and disabilities which have been manifested by Eric since his birth are consistent with and have repeatedly been attributed to brain damage from loss of oxygen during labor and delivery... . Given the absence of any other identifiable factor, *1019 it is concluded that Eric's condition is attributable to birth asphyxia. This conclusion is accordant with the opinion of the neonatologist who treated Eric in the neonatal intensive care unit. He believes that Eric suffered fetal distress due to the partial abruption of the placenta during labor and delivery. He also believes that Eric suffered hypoxic encephalopathy as the result of the umbilical cord being wrapped around his neck.
44. Eric is indisputably permanently and substantially physically impaired. Respondent contends, however, that Eric and his parents are not entitled to compensation under the NICA Plan because he is not substantially mentally impaired. This issue is addressed in more detail in the Conclusions of Law below. As noted above, Eric's condition is the result of damage to his brain. As a direct result of his injury, Eric will not be able to communicate, attend school or otherwise learn and develop intellectually without substantial accommodation. His social and vocational development have unquestionably been significantly impaired (R. 87-98).
It is obvious, as determined by the hearing officer, that the coverage issue in this case turns on the definition of "birth-related neurological injury" as defined by section 766.302(2), Florida Statutes, which provides:
"Birth-related neurological injury" means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired.
NICA argues that the Birnies are not entitled to compensation under the Plan because Eric tested within normal ranges on specially selected and administered intelligence tests. Based upon those test results and the observations of various witnesses who testified that Eric appears to have an intellectual ability in the normal range, NICA contends that Eric is not substantially and permanently "mentally impaired" and thus does not come within the scope of the statute.
The hearing officer rejected NICA's interpretation of section 766.302(2) as "unduly narrow." We agree and affirm.
NICA urges that section 766.302(2) is in derogation of the common law and thus must be strictly construed; the Birnies, on the other hand, contend that the statute is remedial and thus must be liberally construed. We find, however, that the statute, the literal language of which is in conflict with the stated legislative policy of the act, should be construed so as to give full effect to the legislative policy.
That policy is clearly stated by the legislature as follows:
766.301 Legislative findings and intent. 
(1) The Legislature makes the following findings:
(a) Physicians practicing obstetrics are high-risk medical specialists for whom malpractice insurance premiums are very costly, and recent increases in such premiums have been greater for such physicians than for other physicians.
(b) Any birth other than a normal birth frequently leads to a claim against the attending physician; consequently, such physicians are among the physicians most severely affected by current medical malpractice problems.
(c) Because obstetric services are essential, it is incumbent upon the Legislature to provide a plan designed to result in the stabilization and reduction of malpractice insurance premiums for providers of such services in Florida.
(d) The costs of birth-related neurological injury claims are particularly high and warrant the establishment of a limited system of compensation irrespective of fault.
(2) It is the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation. This plan shall apply only to birth-related neurological injuries.
*1020 The stated policy, therefore, is that the act cover "catastrophic injuries that result in unusually high costs for custodial care and rehabilitation" caused by birth-related neurological injuries. The reason for this policy is to reduce the cost of malpractice insurance for those doctors who perform obstetrics so that they will not be forced from such practice because of the exceptionally high costs of this insurance.
There is no question that Eric suffered birth-related neurological injuries of a catastrophic nature which will result in unusually high costs for custodial care and rehabilitation. Indeed, there is no indication in the record that the cost of his care would be any greater if his cognitive functioning was "substantially impaired." If that is the case, how then is the stated legislative policy promoted by requiring that one suffer both substantial mental and substantial physical impairment? It is the effect that birth-related injuries have on the rate of medical malpractice insurance on obstetricians that the legislature is addressing. Because there is no "free lunch," the cost of caring for children such as Eric must either be included in higher malpractice insurance rates or covered by the Fund. The legislature seems to have expressed a preference that the Fund cover these costs  even if the contributions to the Fund must be increased.
NICA defends its literal interpretation of the statute as requiring both substantial physical and substantial mental impairment by maintaining that the legislature intended such interpretation for the express purpose of excluding from the Plan some children who suffer catastrophic birth-related injuries so that the Plan would remain actuarially sound. If that were indeed the intent of the legislature, it could as well have limited application of the Fund to only those children otherwise qualified who were born right-handed. This classification would be no more foreign to the expressed legislative intent than the literal interpretation NICA now urges.
The court in Winemiller v. Feddish, 568 So.2d 483 (Fla. 4th DCA 1990), cited Rudd v. State ex rel. Christian, 310 So.2d 295 (Fla. 1975), for the following proposition:
[2] In Rudd v. State ex rel. Christian, 310 So.2d 295 (Fla. 1975), the Florida Supreme Court cited the language of Dotty v. State, 197 So.2d 315 (Fla. 4th DCA 1967), with approval, which stated:
In ascertaining the meaning and effect to be given in construing a statute the intent of the legislature is the determining factor. Although in its elementary sense the word `or' is a disjunctive participle that marks an alternative generally corresponding to `either' as `either this or that'; a connective that marks an alternative. There are, of course, familiar instances in which the conjunctive `or' is held equivalent to the copulative conjunction `and', and such meaning is often given the meaning `or' in order to effectuate the intention of the parties to a written instrument or the legislative intent in enacting a statute when it is clear that the word `or' is used in the copulative and not in the disjunctive sense. Pompano Horse Club, Inc. v. State, 1927, 93 Fla. 415, 111 So. 801, 52 A.L.R. 51; see also Pinellas County v. Woolley, Fla.App. 1966, 189 So.2d 217. Particularly do these rules apply, even if the results seem contrary to the rules of construction to the strict letter of the statute, when a construction based on the strict letter of the statute would lead to an unintended result and would defeat the evident purpose of the legislation. Payne v. Payne, 1921, 82 Fla. 219, 89 So. 538.

Dotty at 317-318. While Rudd and Dotty both considered the interpretation of "or" as "and," the reverse is also permitted as can be seen by Pinellas County v. Woolley, cited with approval in the foregoing decisions, in which the court noted:
Other jurisdictions have also acknowledged this rule of construction that the words "or" and "and" may be interchanged when it is required to effectuate the obvious intention of the Legislature and to accomplish the purpose of the state. See ... Duncan v. Wiseman Baking Co., 357 S.W.2d 694 (Ky.App. 1962); ... Peacock v. Lubbock *1021 Compress Co., 252 F.2d 892 (C.A. 5th 1958) (remainder of citations omitted).

Pinellas County, 189 So.2d at 219. In both Peacock and Duncan the courts construed "and" to be "or" in order to accomplish the legislative intent of the statute. More recently, in Comptroller of Treasury v. Fairchild Industries Inc., 303 Md. 280, 493 A.2d 341 (1985), the Maryland appellate court followed the same rule noting that:
[C]ircumstances may require courts to construe the word "and" to mean "or" whenever such a conversion is mandated by the context of the words used; the principle is applicable to legislative enactments where it is necessary to effectuate the obvious intention of the legislature (citations omitted).

Comptroller 493 A.2d at 344. Therefore, it is well settled in the law that courts may construe "and" as "or" in statutes where legislative intent mandates it.
Therefore, because of the stated legislative policy of the NICA Plan, we construe the definition of "birth-related neurological injury" to include those injuries which cause permanent and substantial impairment, mental and/or physical.
Because we realize the possible impact of this decision on the fund and on pipeline cases, we stay our mandate and certify the following question to the Florida Supreme Court as one of great public importance:
IN ORDER TO OBTAIN COVERAGE UNDER THE FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY PLAN AS PROVIDED IN SECTIONS 766.301-316, FLORIDA STATUTES, MUST AN INFANT SUFFER BOTH SUBSTANTIAL MENTAL AND SUBSTANTIAL PHYSICAL IMPAIRMENT, OR CAN THE DEFINITION BE CONSTRUED TO REQUIRE ONLY SUBSTANTIAL IMPAIRMENT, MENTAL AND/OR PHYSICAL?
AFFIRMED.
DAUKSCH and ANTOON, JJ., concur.

ON MOTION FOR REHEARING
Appellant, Florida Birth-Related Neurological Injury Compensation Association (NICA) urges in its motion for rehearing that we overlooked the legislative admonition in section 766.301(2), Florida Statutes, that it intended that NICA only fund "a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation. The plan shall apply to birth-related neurological injuries." (Emphasis added.)
Although we did consider this provision in reaching our earlier decision, because we did not explicitly discuss this "limited class" argument in our opinion, NICA's concern is understandable.
It is our belief that when the legislature stated its intent to cover only those catastrophic injuries which are birth-related neurological injuries, it intended to distinguish such injuries from other birth-related injuries such as complications from premature births, deformities caused by drugs, the AIDS babies, and babies addicted to drugs at birth. Because it is only the birth-related neurological injuries that normally pose a high risk to "physicians practicing obstetrics," this interpretation is most consistent with the legislative finding and intent so clearly enunciated in section 766.301. Further, even though the statute discriminates in favor of those birth-related injuries that are "neurological," the disparate treatment is justified because the classification, based on a legitimate state policy, is reasonable. However, if we construe the "limited class" language to further limit the number who would otherwise qualify under the NICA plan to only those who are both physically and mentally impaired, we would have to ignore the legislative "plan designed to result in the stabilization and reduction of malpractice insurance premiums for [obstetricians]" and the reasonableness of the classification would be in doubt.
We did not overlook the "unambiguous" legislative definition of "birth-related neurological injury" which provided that the infant must be "mentally and physically impaired." We observe in our earlier opinion that there *1022 is nothing in this record which indicates that the requirement of dual injuries would affect the "unusually high costs for custodial care and rehabilitation" that results even from a single injury of this nature. Therefore, such classification would not further the goal of reducing the high costs of such injuries and would not reduce the cost of medical malpractice insurance. If the sole reason for the dual injury requirement is to reduce the number of infants suffering catastrophic birth-related neurological injuries who might benefit from the plan, it is every bit as discriminatory (and as unrelated to the overall state policy) as requiring that eligible infants must also be born left-handed or born during the last fifteen days of the month. We do not believe that such was the legislature's intent.
Motion for Rehearing is Denied.
DAUKSCH and ANTOON, JJ., concur.
NOTES
[1] The parties agreed that the issue of damages would be abated until the resolution of this issue.