686 So.2d 1349 (1997)
FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION ASSOCIATION, Petitioner,
v.
FLORIDA DIVISION OF ADMINISTRATIVE HEARINGS, et. al., Respondents.
No. 87233.
Supreme Court of Florida.
January 16, 1997.
*1350 Bruce Culpepper and William E. Whitney of Pennington, Culpepper, Moore, Wilkinson, Dunbar & Dunlap, P.A., Tallahassee; W. Douglas Moody, Jr. of Bateman Graham, Tallahassee; and David W. Black of Frank, Effman, Weinberg & Black, P.A., Plantation, for Petitioner.
Larry Sands of Sands, White & Sands, P.A., Daytona Beach, for Respondents.
PER CURIAM.
We have for review a decision passing upon the following question certified to be of great public importance:
IN ORDER TO OBTAIN COVERAGE UNDER THE FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY PLAN AS PROVIDED IN SECTIONS 766.301-316, FLORIDA STATUTES, MUST AN INFANT SUFFER BOTH SUBSTANTIAL MENTAL AND SUBSTANTIAL PHYSICAL IMPAIRMENT, OR CAN THE DEFINITION BE CONSTRUED TO REQUIRE ONLY SUBSTANTIAL IMPAIRMENT, MENTAL AND/OR PHYSICAL?
Florida Birth Related Neurological v. Florida Div. of Admin. Hearings, 664 So.2d 1016, 1021 (Fla. 5th DCA 1995). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We approve the result of the district court's decision but not the reasoning thereof.

PROCEDURAL HISTORY
On July 19, 1991, Judith and Fred Birnie, as parents and natural guardians of their son, Eric Birnie, who was born on March 12, 1989, timely filed a petition for compensation for birth-related neurological injuries pursuant to the Florida Birth-Related Neurological Injury Compensation Plan, sections 766.301-766.316, Florida Statutes (1995).[1] Petitioner NICA, the Florida Birth-Related Neurological Injury Compensation Association, disputed the Birnies' claim for compensation based on its conclusion that Eric had not suffered an injury covered by section 766.302(2) because he was not "substantially mentally impaired." An administrative hearing subsequently was held to determine whether Eric's injury was covered under the Plan.[2] Rejecting as unduly narrow NICA's assertion that "mental impairment" should be equated with "cognitive functioning as measured by intelligence tests" for purposes of compensation under the NICA Plan, the hearing officer concluded that Eric "is permanently and substantially mentally and physically impaired and has suffered a `birth-related neurological injury,' within the meaning of section 766.302(2), Florida Statutes."
*1351 NICA appealed the hearing officer's order granting the Birnies' petition for compensation under the Plan. The district court affirmed the order, finding that the stated legislative policy behind the Plan could not be given effect by requiring that an infant "suffer both substantial mental and substantial physical impairment." Thus, the Fifth District went beyond the hearing officer's reading of the statute and construed the definition of "birth-related neurological injury" to include those injuries which cause "permanent and substantial impairment, mental and/or physical." Florida Birth Related, 664 So.2d at 1021. However, recognizing "the possible impact of this decision on the fund and on pipeline cases," id., the Fifth District stayed its mandate and certified to us the above question as one of great public importance.

FACTS
Eric Ryan Birnie was born to Judith and Fred Birnie on March 12, 1989, at Halifax Hospital in Daytona Beach. As a result of birth-related events causing oxygen deprivation, Eric suffered a focal injury to the basal ganglia, an area of the brain which aids the body in performing "physical functions." The physician delivering obstetrical services during the birth of Eric was a "participating physician" with the Florida Birth-Related Neurological Injury Compensation Plan.
In July, 1991, when Eric was two years and four months old, the Birnies filed a petition for compensation for a birth-related neurological injury which NICA contested based on its conclusion that Eric had not suffered an injury covered by section 766.302(2), Florida Statutes (1991), because he was not "substantially mentally impaired." An administrative hearing was held to determine whether Eric's injury was covered by the Plan.
After hearing the evidence, the hearing officer rendered his decision finding that Eric had suffered a birth-related neurological injury and granted the Birnies' petition for compensation under the Plan. He specifically found that during the delivery, Eric had suffered "perinatal asphyxia ... hypoxic ischemia encephalopathy," the loss of oxygen to the brain. Additional findings of fact were included in the final order, the relevant portions of which were quoted in the Fifth District's opinion as follows:
24. After Eric was discharged from the hospital, he was evaluated by Dr. James Nealis, a pediatric neurologist. Dr. Nealis first evaluated Eric on March 29, 1989. Under his direction, a number of tests and evaluations were conducted. A Genetics test did not reveal any abnormalities. Similarly, a urine metabolic screen and thyroid function study did not reveal any problems.
....
27. An examination of Eric on January 11, 1990, indicated that he was experiencing some developmental delay. He had poor control of his head and he could not sit alone.
28. Eric began a special program at Easter Seals at approximately 11 months of age. At the time, Eric's gross motor skills were evaluated at 4 months and his fine motor skills were thought to be 4½ months. At 16 months of age, Eric's motor development was still at 4 months. He could not sit alone and could not crawl.
....
30. On August 1, 1990, Eric was evaluated at the Nemours Children's Clinic in Jacksonville, Florida. Dr. William R. Turk performed the evaluation. He noted that Eric's gross motor development was severely limited and concluded that Eric had a static but evolving encephalopathy.
....
32. Dr. Turk summarized his findings in a letter to Eric's pediatrician dated September 25, 1990. That letter indicates that Dr. Turk reviewed Eric's "sequential neuroadiologic studies" and concludes that Eric has "a static encephalopathy manifest[ed] by a dystonic quadriplegia" as the result of "an evolving but remote hypoxic ischemic insult."

*1352 ....
35. In his 35 month evaluation conducted by Easter Seals, it was noted that Eric was functioning at an age equivalent of 8 months in gross motor skills. Eric was approximately age equivalent in receptive language skills, but he was functioning at only 24 months in expressive language skills. Eric was also demonstrating significant delay in oral motor skills. He had limited tongue mobility and was unable to lateralize, raise or lower his tongue. He was only able to produce a small number of vowel and consonant sounds.
36. On February 10, 1993, the Volusia County School Board administered a number of tests to Eric in order to evaluate him for placement in their exceptional student program. At the time of the evaluation, Eric was not able to stand, his manual dexterity was limited and special effort and attention was necessary to understand his verbal communications. Because of Eric's profound physical handicaps, the tests were specially selected and administered. The test results indicated that Eric was average or even above in his cognitive skills and preacademic skills. As a result, the School Board anticipates that Eric will ultimately be educated in a mainstream classroom with nonhandicapped students of his own age group. He will, however, need special accommodations within the classroom to address his physical handicaps and limitations.
37. The evidence established that it is very difficult to accurately assess the intellectual ability of a young child, especially a severely handicapped child such as Eric. While it is impossible to determine whether Eric's intellectual test results would have been higher if he had not suffered an hypoxic insult at birth, it is likely that the limitations on his exploratory capabilities caused by his physical handicaps have impaired his intellectual development to some degree.
38. At the time of the hearing in this case, Eric was 4½ years old. He was unable to stand up, walk or crawl. His only method of independent mobility was to roll over. The use of his hands and arms was very limited. He also had great difficulty talking and/or communicating and he must take long pauses to formulate a response to any inquiry.
39. Eric's brain dysfunction is permanent. Because Eric's speech is greatly impacted by his condition, it is virtually certain that he will always be severely limited in his verbal expression and other communication skills. While continued therapy may help him to communicate better and to become somewhat more mobile, he will almost certainly never be able to walk, feed, groom or toilet himself.
40. The evidence established that Eric's problems are the result of damage to the basal ganglia deep inside his brain. Although it can not be determined conclusively, it is more likely than not that the "white matter" surrounding the basal ganglia have also been damaged to some degree which may impact his perceptual and processing abilities.
....
43.... Eric sustained an injury to the brain caused by oxygen deprivation in the course of labor, delivery or resuscitation in the immediate post-delivery period. The injuries and disabilities which have been manifested by Eric since his birth are consistent with and have repeatedly been attributed to brain damage from loss of oxygen during labor and delivery.... Given the absence of any other identifiable factor, it is concluded that Eric's condition is attributable to birth asphyxia. This conclusion is accordant with the opinion of the neonatologist who treated Eric in the neonatal intensive care unit. He believes that Eric suffered fetal distress due to the partial abruption of the placenta during labor and delivery. He also believes that Eric suffered hypoxic encephalopathy as the result of the umbilical cord being wrapped around his neck.
44. Eric is indisputably permanently and substantially physically impaired. Respondent *1353 contends, however, that Eric and his parents are not entitled to compensation under the NICA Plan because he is not substantially mentally impaired. This issue is addressed in more detail in the Conclusions of Law below. As noted above, Eric's condition is the result of damage to his brain. As a direct result of his injury, Eric will not be able to communicate, attend school or otherwise learn and develop intellectually without substantial accommodation. His social and vocational development have unquestionably been significantly impaired.
Florida Birth Related, 664 So.2d at 1017-19.
The hearing officer also made the following conclusions of law pertinent to the issue of statutory construction before us here:
54. The evidence in this case established that Eric suffered an injury to the brain caused by oxygen deprivation during the course of labor, delivery or resuscitation in the immediate post-delivery period. The more difficult issue is whether Eric's injury falls within the scope of the statute. Eric is indisputably permanently and substantially physically impaired as a result of the damage to his brain. Respondent argues that Petitioners are not entitled to compensation under the NICA Plan because Eric tested within normal ranges on specially selected and administered intelligence tests. Based upon those test results and the observations of various witnesses who testified that Eric appears to have an intellectual ability in the normal range, Respondent contends that Eric is not substantially and permanently "mentally impaired" within the scope of the statute. [footnote 2]
Essentially, Respondent argues that mental impairment should be equated with cognitive functioning as measured by intelligence tests and any child who tests within normal ranges on an intelligence test is not entitled to receive compensation under the NICA Plan irrespective of the special accommodations necessary to administer the tests and/or the social and vocational limitations on the child as a result of his injury. This interpretation is rejected as unduly narrow.
....
61. In sum, it is concluded that, as a direct result of his brain injury and consequent physical limitations, Eric will not be able to translate his cognitive capabilities into adequate learning in a normal manner. Moreover, as a direct consequence of his injuries, Eric's social and vocational development have been drastically impaired. Consequently, it is concluded that Eric is permanently and substantially mentally and physically impaired and that Eric has suffered a "birth-related neurological injury," within the meaning of Section 766.302(2), Florida Statutes. Accordingly, the subject claim is compensable under the NICA Plan. Sections 766.302(2), 766.309(2), and 766.31(1), Florida Statutes. This interpretation furthers the legislative intent to provide compensation to a limited class of catastrophically injured infants on a no-fault basis to help alleviate the malpractice insurance crisis facing physicians practicing obstetrics.
[footnote 2:] Petitioners have suggested that the NICA Plan should be interpreted to cover any child who is permanently and substantially mentally impaired. In this regard, Petitioners point out that the statute purports to cover spinal cord damage resulting from mechanical injury even though the damage in such a case would be primarily physical. To the extent that Petitioners contend that the NICA Plan covers injuries that result in only physical or mental impairment, their interpretation is rejected. The Statute is written in the conjunctive and can only be interpreted to require permanent and substantial impairment that has both physical and mental elements. Thus, a deformity or loss of limb would not ordinarily be covered under the NICA Plan. [end footnote 2]

ANALYSIS
This case presents this Court with a straightforward question of statutory interpretation and construction. That is, should the word "and," as used in the phrase "substantially mentally and physically impaired" in section 766.302(2) be read in the conjunctive, *1354 or must it be replaced with the word "or" and read in the disjunctive to remain consistent with the legislature's intent in enacting the NICA statute? Although certifying the question for our review, the Fifth District construed "the definition of `birth-related neurological injury' to include those injuries which cause permanent and substantial impairment, mental and/or physical," Florida Birth Related, 664 So.2d at 1021, based upon its finding that the literal language of the statute was in conflict with "the stated legislative policy of the act." Id. at 1019.
The NICA Plan was established by the legislature "to provide compensation, on a no-fault basis, for a limited class of catastrophic [birth-related neurological] injuries that result in unusually high costs for custodial care and rehabilitation." § 766.301(2), see also § 766.303(1). As the Birnies did here, the injured infant or his personal representative may seek compensation under the Plan by filing a claim for compensation with the Division of Administrative Hearings (DOAH) within five years of the infant's birth. See §§ 766.302(3), 766.303(2), 766.305(1), and 766.313. NICA, which administers the Plan, has "45 days from the date of service of a complete claim ... in which to file a response to the petition and to submit relevant written information relating to the issue of whether the injury is a birth-related neurological injury." § 766.305(3).
If NICA determines that the injury alleged in a claim is a compensable birth-related neurological injury, it may award compensation to the claimant, provided that the award is approved by the hearing officer to whom the claim has been assigned. § 766.305(6). If, on the other hand, NICA disputes the claim, as it did in this case, the dispute must be resolved by the assigned hearing officer in accordance with the provisions of Chapter 120, Florida Statutes (1995). §§ 766.304, 766.307, 766.309, 766.31. Pertinent to the issue before us, the hearing officer must determine whether the infant's injury is compensable under the statute.
Section 766.302(2) states:
"Birth-related neurological injury" means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery in a hospital, which renders the infant permanently and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.
Where, as here, the legislature has not defined the words used in a phrase, the language should usually be given its plain and ordinary meaning. Southeastern Fisheries Ass'n, Inc. v. Department of Natural Resources, 453 So.2d 1351 (Fla.1984). Nevertheless, consideration must be accorded not only to the literal and usual meaning of the words, but also to their meaning and effect on the objectives and purposes of the statute's enactment. See Florida State Racing Comm'n v. McLaughlin, 102 So.2d 574 (Fla. 1958). Indeed, "[i]t is a fundamental rule of statutory construction that legislative intent is the polestar by which the court must be guided [in construing enactments of the legislature]." State v. Webb, 398 So.2d 820, 824 (Fla.1981).
In Florida Birth-Related Neurological Injury Compensation Ass'n v. McKaughan, 668 So.2d 974 (Fla.1996), we approved the decision of the district court below wherein the district court explained,
because the [NICA] Plan, like the Worker's Compensation Act, is a statutory substitute for common law rights and liabilities, it should be strictly construed to include only those subjects clearly embraced within its terms.... [and] a legal representative of an infant should be free to pursue common law remedies for damages resulting in an injury not encompassed within the express provisions of the Plan.
Humana of Florida, Inc. v. McKaughan, 652 So.2d 852, 859 (Fla. 2d DCA 1995)) (citation *1355 omitted); see also Carlile v. Game & Fresh Water Fish Comm'n, 354 So.2d 362, 364 (Fla. 1978); Adventist Health System/Sunbelt v. Hegwood, 569 So.2d 1295 (Fla. 5th DCA 1990) (stating that statutes designed to supersede or modify rights provided by common law must be strictly construed and will not displace common law remedies unless such an intent is expressly declared).
In light of these well-settled rules of statutory construction, the Fifth District's conclusion that the word "and" in the phrase "permanently and substantially mentally and physically impaired," should not be read in the conjunctivebut instead replaced with the word "or" and read in the disjunctiveis inappropriate here. The instant case is clearly distinguishable from those cases upon which the Fifth District relies for the proposition that courts may construe the word "and" as the word "or" in statutes where legislative intent mandates it.
In Winemiller v. Feddish, 568 So.2d 483 (Fla. 4th DCA 1990), the appellant sustained injuries when the pedal of the bike she was riding hit a coral rock in the swale of appellee's property. The appellant subsequently filed a two-count complaint against the appellee. Count I of the complaint alleged common law negligence for failure to properly maintain the swale area, and Count II alleged a violation of a city ordinance which appellant alleged was negligence per se. Id. at 484. The city ordinance in question stated:
The placement and maintenance of shrubbery, above-the-ground sprinkler systems, mailboxes, signs, tree trimmings, refuse, concrete blocks, coral rock, pyramid-shaped cement curbstones, or any other sharp-edged or pointed organic or nonorganic or poisonous material which could cause a road or traffic hazard, or injury to pedestrians, on the swale area adjacent to the public right-of-way within the ten-foot area measured from the edge of the paved surface of the vehicular right-of-way is prohibited.
Winemiller, 568 So.2d at 484 (quoting Tamarac, Fla., Ordinances Art. I, § 23.2(c) (1990)). The appellee in Winemiller filed a motion for summary judgment on Count II and asserted that the ordinance in question did not apply to him since it was the previous owner who had placed the rocks in the swale, and not himself. Finding that the ordinance only prohibited the placement and maintenance of the rocks, not the placement or maintenance, the trial court entered summary judgment for the appellee. Id. On appeal, the Fourth District was faced with determining the proper construction of the city ordinance. The Fourth District concluded: "We agree with appellant that the obvious purpose of this ordinance is to prevent injuries to the travelling public. To exempt some hazards in the swales because they were not placed there by the current owners even though they continue to be maintained by the owners would thwart the purpose of the legislation. The construction advocated by appellee is thus unreasonable." Id.
Winemiller and the cases discussed therein all illustrate situations where the word "and" or "or" could not be read literally or given its ordinary meaning because to do so would lead to unreasonable, absurd results and thus defeat the legislature's intent. Accord Holly v. Auld, 450 So.2d 217 (Fla.1984). Unlike those cases, however, reading the word "and" as used in the phrase "permanently and substantially mentally and physically impaired," section 766.302(2), in the conjunctive does not lead to absurd results, nor does it undermine the legislative policy in enacting the NICA statute.
Quite to the contrary, reading the phrase as it is plainly written and construing the word "and" in the conjunctive is completely consistent with the legislature's intent to "provide compensation, on a no-fault basis, for a limited class of catastrophic injuries," § 766.301(2), in an effort to stabilize and reduce malpractice insurance premiums for providers of obstetric services in Florida. See § 766.301(c). In fact, the hearing officer in this case specifically rejected the Fifth District's subsequent interpretation of the statute in its final order, noting: "To the extent that Petitioners contend that the *1356 NICA Plan covers injuries that result in only physical or mental impairment, their interpretation is rejected. The Statute is written in the conjunctive and can only be interpreted to require permanent and substantial impairment that has both physical and mental elements." Further, as previously noted, the hearing officer made a factual determination that this case falls within the statute even when the statute is given its plain meaning.

CONCLUSION
We are left with the hearing officer's findingwhich is properly predicated on a reading of the statute in the conjunctive that Eric Bernie is "permanently and substantially mentally and physically impaired and ... has suffered a `birth-related neurological injury' within the meaning of section 766.302(2)." Having thoroughly reviewed the record and the hearing officer's final order, we conclude that it is supported by competent and substantial evidence. Consequently, we disapprove the opinion below to the extent that it misconstrues the plain language of the statute, but approve the result, and direct that the case be remanded to DOAH for a determination of the amount of compensation Eric is entitled to under the NICA Plan.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Herein, the NICA statute, or the Plan.
[2] Before the hearing, the parties agreed that the amount of compensation, if any, should be bifurcated from the issue of compensability. Consequently, no evidence was presented at the hearing on the issue of benefits.