# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-1130
_____

FLORIDA BIRTH-RELATED
NEUROLOGICAL INJURY
COMPENSATION ASSOCIATION,

    Appellant,

    v.

ELINA DUDKINA and VADIM
KUSHNIR, on behalf of and as
parents and natural guardians
of W.K., a minor,

    Appellees.


_____


On appeal from the Division of Administrative Hearings.
W. David Watkins, Administrative Law Judge.

February 12, 2025

TANENBAUM, J.

Florida law establishes the Florida Birth-Related Neurological Injury Compensation Plan (the "Plan") "for the purpose of providing compensation, irrespective of fault, for birth-related neurological injury claims." § 766.303, Fla. Stat. The eponymous Association ("NICA"), the appellant here, administers the plan. *Id.* Elina Dudkina and Vadim Kushnir are the parents of W.K., who appears to have suffered some injury tracing back to complications at birth. His parents filed a claim under the Plan, a claim NICA disputed after reviewing it—NICA concluding the injury did not satisfy the statutory definition of a birth-related neurological injury ("BRNI"). *See* § 766.305, Fla. Stat. (setting out

process for parents' filing of a claim and for NICA's consideration and response).

Entitlement to compensation under the Plan being a matter of public-right created by statute, the Legislature tasked Florida's Division of Administrative Hearings and its administrative law judges ("ALJs") with determining disputes over that entitlement under the Administrative Procedure Act, chapter 120, Florida Statutes. *See* §§ 766.304, 766.309, 766.311, Fla. Stat.; *see also Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings*, 686 So. 2d 1349, 1354 (Fla. 1997) ("*Birnie*") (providing that if NICA disputes a claim, "the dispute must be resolved by the assigned hearing officer in accordance with the provisions of Chapter 120").[1] Taking the parents' testimony in person and considering medical records and transcripts of various medical experts' depositions, the ALJ rendered a final order determining the parents' claim to be compensable. NICA challenges that order here on several grounds.

We set aside the order based on one: For their claim to be compensable, the parents had to demonstrate, at a minimum, W.K. suffered a BRNI, defined in part as an "injury to the brain or spinal cord of a live infant . . . which renders the infant permanently and substantially *mentally and* physically impaired." § 766.302(2), Fla. Stat. (emphasis supplied). Our focus is on the highlighted text, which we discuss in more detail below. Ultimately, we conclude there was insufficient evidence demonstrating that W.K. was *mentally* impaired—certainly not "permanently and substantially"—in addition to his physical impairment.

I

W.K.'s birth was by no means trouble-free, this being readily apparent from the record evidence. There was bloody discharge beforehand, which caused concern among the attending staff. W.K.'s passage through the birth canal accelerated, and he experienced multiple "decelerations" of his heart rate. Staff from the neonatal intensive care unit were summoned. W.K. emerged

---

[1] "Birnie" is the surname of the injured child on whose behalf a claim was made in that case.

with the nuchal cord wrapped around his neck. Facial bruising as well as more bloody discharge were present. His one-minute Appearance, Pulse, Grimace, Activity, and Respiration ("APGAR") score was a five out of a possible ten, which is not good.

Despite the initial complications during the birth, W.K.'s five-minute APGAR score improved to a nine out of ten, which was normal. After birth, no hospital intervention was necessary to assist W.K. In fact, there was no conflict in evidence showing W.K. was discharged normally, with an "apparently uncomplicated newborn course." W.K. exhibited no signs or symptoms indicative of a brain injury when he left the hospital, "routine newborn care" being indicated for discharge. Later, W.K.'s three-day, fourteen-day, and one-month well-baby check-ups showed normal development and feeding, and there were no significant problems or concerns.

Thirty-four days following his birth, however, W.K. went to the hospital for seizure-like activity. The intensive-care report noted that although previously healthy, W.K. had begun twitching for around five to seven minutes at a time, symptomology that continued at the hospital. Additionally, a scan of W.K.'s head showed bleeding on his brain—an acute subdural hematoma—which the ALJ determined from record evidence likely initiated in some way during the birth, documentation in the record indicating the hematoma was chronic as well. There was evidence of brain swelling, and the hematoma in turn damaged W.K.'s brain matter.

The brain damage led to some impairment. According to reported occupational and physical therapy assessments performed on W.K. at the time—that is, at the eighty-one-days-old mark—he showed developmental delay in motor skills, and occupational therapy intervention was recommended. There also was concern about vocal cord paralysis and impaired oral motor skills affecting normal feeding. W.K. was referred to physical therapy, the assessment being that W.K. had delayed gross motor milestones, abnormal posture, weakness, and abnormal tone. The impairment, though, was not bilateral, instead mostly limited to W.K.'s right side. According to testimony from one of the claimants' medical experts—the only one of their doctors to have conducted an assessment of W.K. a couple years later, closer to the final

3

hearing—testimony recapitulated in the ALJ's order—W.K. nevertheless was "able to manipulate objects perfectly normally with his left hand" but not with his right, his right arm and hand appearing to be weaker and less coordinated. This made it harder for W.K. to do things like take his shirt off and put it back on without help. Still, W.K. was able to run, to kick a ball with his left foot. The unrebutted testimony of NICA's pediatric neurologist, meanwhile—also quoted by the ALJ—noted a lack of "substantial motor impairment" but acknowledged W.K.'s demonstrated "asymmetry of functionality."

This, essentially, is W.K.'s *physical* impairment—appearing permanent, but, as the same NICA expert observed, without loss of muscle tissue, loss otherwise indicative of substantial brain injury. Despite it appearing on this record that the physical impairment was sufficiently "substantial" to satisfy that aspect of the BRNI—we reject NICA's challenge in this respect—the parents still had to demonstrate W.K. was *mentally* impaired, both permanently and substantially. On that front, the ALJ made almost no findings of fact, engaging instead in speculation and risk assessment based on W.K.'s physical impairments to reach a determination about mental impairment, then failing to assess any permanency in the impairment. The following is the ALJ's conclusion:

> He is at high-risk for developmental *delays*. He exhibits abnormalities with respect to *visual tracking*. He has *hypertonia* and abnormal extension patterns. He suffered from oropharyngeal and pharyngeal dysphagia and mild to moderate *feeding difficulties*. He was at high risk for silent aspiration. His oral *motor skills* were interfering with his nutrition, and he has inadequate *sucking* skills. Other *motor* skills are likewise abnormally *delayed*. He has abnormal *posture and weakness*. The extensive limitations on [W.K.'s] capabilities have impaired his intellectual development *to some extent*. Dr. Duchowny [NICA's expert] conceded as much.

(emphases supplied).

## II

### A

The ALJ in this case relied heavily on the supreme court's analysis in *Birnie* to conclude W.K. had suffered permanent and substantial *mental* injury. The supreme court there quoted at length from the ALJ's order in the underlying case, setting out thirteen of the order's findings, among them a finding that "test results indicated that Eric [the injured child in that case] was average or even above in his cognitive skills"; a determination that "Eric will ultimately be educated in a mainstream classroom with nonhandicapped [*sic*] students of his own age group," but with "special accommodations"; an inference "that he will always be severely limited in his verbal expression and other communication skills"; and an assessment that the child's "social and vocational development have unquestionably been significantly impaired" and that he "will not be able to communicate, attend school or otherwise learn and develop intellectually without substantial accommodation." *Birnie*, 686 So. 2d at 1352–53. The ALJ there rejected the argument "that mental impairment should be equated with cognitive functioning as measured by intelligence tests," concluding that "Eric is permanently and substantially mentally and physically impaired" because his severe physical limitations will interfere with his ability "to translate his cognitive capabilities into adequate learning in a normal manner" and "drastically impair[]" his "social and vocational development." *Id.* at 1353.

After answering the district court's certified question—stating that the statutory language governing the Plan required a child's impairment to be *both* physical *and* mental to qualify as a BRNI—the supreme court held the ALJ's order to be "supported by competent and substantial evidence" and approved the ultimate determination that the child suffered a compensable BRNI under the Plan. *See id.* at 1355–56. In reaching that holding in *Birnie*, however, the supreme court did not provide much analysis on how the statutory text "permanently and substantially mentally [] impaired" should be applied. *Cf. id.* at 1356. While the court's opinion for the most part leaves us with a holding limited to the set of facts detailed in the opinion, the court's decision still seems to have been driven primarily by the severity of the *physical*

5

impairment, impairment so severe it impelled an evidentiary inference of mental impairment as well—even though, as the ALJ acknowledged, "it is very difficult to accurately assess the intellectual ability of a young child, especially a severely handicapped child such as Eric." *Id.* at 1352; *cf. id.* at 1352–53 (highlighting the ALJ's focus on the limiting effect the severe physical impairment would have on normal cognitive, social, and vocational development).

It is the severity of the child's physical impairment in *Birnie*, then, that distinguishes it from the facts of this case. To illustrate this contrast, we first summarize the child's physical impairments found by the ALJ in *Birnie*, as follows:

1. Gross-motor-skill development the equivalent of a four-month-old at the age of sixteen months, and that development otherwise determined to be "severely limited";

2. At age thirty-five months, the child's gross motor skills functioning at the equivalent of an eight-month-old skills; and "demonstrating significant delay in oral motor skills," limited tongue mobility, an inability "to lateralize, raise or lower his tongue," and *ability to produce only a small number of sounds*;

3. Characterized both as a "*severely* handicapped child" and as having "*profound* physical handicaps";

4. At the age of four and a half years, "unable to stand up, walk or crawl"; had "very limited" use of his hands and arms; and "also had great difficulty talking and/or communicating," such that he "must take long pauses to formulate a response to any inquiry";

5. Permanent "brain dysfunction," such that the child "virtually certain . . . [to] always be *severely limited* in his verbal expression and other communication skills"; and "*almost certainly [will] never be able to walk, feed, groom or toilet himself.*"

*Id.* at 1352–53 (emphases supplied).

6

Next, we look at the facts pertaining to W.K.'s physical impairment in this case. They can be summarized as follows:

1. According to the deposition testimony of the parents' pediatric neurologist: W.K. is able to run, follow commands, manipulate objects with his left hand ("perfectly normally"), and kick a ball with his left foot; and while able to clap, raise, wave, or open his hands, his right arm and hand are less coordinated and weaker than his left;

2. According to the deposition testimony of NICA's pediatric neurologist: severity of W.K.'s impairment is characterized as "mild"; W.K. "appropriately developed," with no atrophy in his limbs—that is, no loss of muscle tissue as typically would be seen with substantial brain injury; able to point to his nose and ears, stick out his tongue, and show his belly button on command without hesitation; able to run and turn crisply; and his "receptive language was intact," so his motor planning and response are correct and he is able to understand and carry out one-step demands; "[f]unction in both [] the left and the right side of [W.K.'s] brain [] working well," with one side likely having "taken up function on the other side," but functions otherwise seeming "to be relatively preserved";

3. Also according to the deposition testimony of NICA's neurologist: W.K. is able to use a fork and spoon and to drink normally, albeit with frequent spillage; possesses "decent vocabulary" and can speak in phrases; expressive language skills are age-appropriate, but clarity of speech is poor and below age-level expectations; at the same time, W.K.'s language development in two languages is "actually rather impressive"; he has "good eye movements" and "good gaze fixation," with no "visual field defect"; and is also socially integrated, with good social development and ability to relate to his parents and engage and follow instructions;

4. According to the parents' testimony at the final hearing: W.K. likes to play at the park every day, to run, to swim, to play with toys, and watch cartoons on

7

television; also, he seems to understand directions in two languages (Russian and English); but has limitations on use of his right side.

B

Without diminishing the significant physical impairment that W.K. appears to have suffered regarding his right side—and the challenges that he will continue to face as a result—we easily can conclude that the child's physical impairment in *Birnie* was much more severe than the medical records and testimony in the record before us show W.K.'s impairment to be. The ALJ in this case nevertheless appears to have found false equivalence between the two sets of facts by looking to the results of occupational and physical therapy assessments conducted when W.K. was about eighty-one days old.

The ALJ recounted, as part of his findings, occupational and physical therapy assessments conducted when W.K. was about eighty-one days old; these assessments being found in the health and medical records submitted by the parties as stipulated evidence. Neither of the providers who wrote the assessments was deposed or otherwise testified before the ALJ. Unable to do anything more with the assessments than quote from them, the ALJ merely highlighted the initial determination—made by a therapist about fifty days after W.K. started experiencing seizure-like activity and it was discovered he had an acute subdural hematoma—that W.K. was "at high-risk [*sic*] for developmental delays"; had a variety of physical limitations; would have feeding difficulties; would have impaired oral motor skills, which in turn will interfere with age-appropriate nutrition intake; and, because of some of his physical limitations, W.K. would have delayed gross motor milestones.

These predictions of course contradict the assessments made of W.K.'s physical and cognitive abilities a couple years later and detailed in testimony. The ALJ nevertheless relied on the much earlier, unsworn assessments to conclude that W.K. had suffered a BRNI, in the process quoting *Birnie* as follows: "While it is impossible to determine whether [the child's] intellectual test results would have been higher if he had not suffered an hypoxic insult at birth, it is likely that the limitations on his exploratory

8

capabilities *caused by his physical handicaps* have impaired his intellectual development to some degree." *Birnie*, 686 So. 2d at 1352 (emphasis supplied). To reach the conclusion about W.K.'s mental impairment, the ALJ seems to have treated the supreme court's implicit use of inference in *Birnie*—a case in which there was not just a substantial physical impairment but a severe one—as approval for not requiring hard proof of mental impairment in any case in which a physical impairment has been proven. This was error.

The ALJ misapplied *Birnie* by engaging in the "special-case" logical fallacy. *See* PETER KREEFT, SOCRATIC LOGIC 87 (3.1 ed. 2014) (describing the fallacy as arguing that because "something is true in some special case," it must be "true simply"). Recall that *Birnie* answered a certified question, holding that *both* physical *and* mental impairment must be proven for an injury to qualify as a BRNI. *See Birnie*, 686 So. 2d at 1355–56. *Birnie* then was a special case (factually) that "*presupposes* the rule" the court had just announced. KREEFT, SOCRATIC LOGIC at 87. Despite the difficulties in establishing, as an evidentiary matter, the "intellectual ability of a young child," there was evidence of the child's "social and vocational development" having "been drastically impaired" and of his physical limitations being so severe that he would "not be able to translate his cognitive capabilities." *Birnie*, 686 So. 2d at 1352, 1353. In those special circumstances (given the severity of the child's physical impairment), the court implicitly approved the ALJ's inference that there necessarily also would be mental impairment by concluding there was "competent and substantial evidence" to support the ALJ's conclusion that both the physical and mental impairment elements had been established.

The principle behind the supreme court's interpretation of the definition of a BRNI nevertheless holds true here: that the Legislature intended for the Plan to provide compensation only "for a limited class of catastrophic injuries," that limitation manifested in use of the conjunctive "and" to require a showing of *both* mental *and* physical impairment. Missing from the record of the hearing before the ALJ in this case is competent evidence of an evaluation showing that, *at the time of the final hearing*, W.K.'s cognitive, social, or vocational abilities were impaired. The only

"evidence" on which the ALJ relied to infer that W.K. had a mental impairment was gleaned from the record excerpts the ALJ quoted in his order regarding a very early assessment performed at eighty-one days of age.

That assessment occurred roughly two years before the final hearing. Given the testimony about W.K.'s later physical development, the early assessments at best could be considered speculation based on limited information available at the time— speculation that became irrelevant once more information about W.K.'s physical development came to light as W.K. grew older.[2] In the light of the testimony from both pediatric neurologists and from W.K.'s parents about his physical functionality—the ability to run and play and swim and eat and visually track; not to mention his cognitive functionality—the ability to communicate in two languages, the receptive and expressive language skills; the earlier assessments that projected his social and vocational development no longer had a factual foundation to support reliance on them to make any inferences about W.K.'s mental impairment *at the time of the hearing.*

We note the absence of any testimony from the authors of those eighty-one-days-old assessments about how W.K.'s subsequent physical development might affect the projections set

---

[2] Similarly, the claimants' pediatric neurologist opined via affidavit that W.K. "will require ongoing occupational and physical therapy to address [his] development deficits," this referring to the same early, eighty-one-days-of-age assessments regarding his need for therapy. The pediatric neurologist also surmised that the type of brain injury suffered by W.K. "is of the type that often leads to learning disabilities . . . although the effects of these *will not become apparent until he is school age.*" (emphasis supplied). This affidavit was executed approximately two years after performance of the assessment it referenced, ten months before the neurologist gave his deposition, and one year before the final evidentiary hearing. It simply is not reasonable to favor these stale and speculative assertions early on in W.K.'s life over seemingly contrary evidence regarding W.K.'s condition closer in time to the hearing.

out in those assessments. Also missing was any *direct* evidence of a *current* and substantial mental impairment; the only evidence bearing on W.K.'s cognitive function pointed in the other direction—away from a substantial impairment.

III

We have the authority to "set aside agency action" and "remand [a] case for further agency proceedings" if we find that the "agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record." § 120.68(6)(a)1., (7)(b), Fla. Stat. We of course are mindful of the Legislature's caveat that we "shall not substitute [our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." *Id.* (7)(b). Yet, that is not what we have done here. As noted above, there was very little live testimony given before the ALJ—basically, just from the parents; most of the evidence was introduced by stipulation: records, deposition transcripts, and other sworn statements. While we would be "loathe to reverse" an administrative hearing officer "who has had the opportunity to observe the manner and demeanor of live witnesses," we as an appellate court are "in the same position in examining the record as is the" hearing officer when he bases his final determination on "transcribed testimony and exhibits." *Dukes v. Dukes*, 346 So. 2d 544, 545 (Fla. 1st DCA 1976); *see also Kelly v. Fla. Atl. Univ.*, 413 So. 2d 833, 833 (Fla. 1st DCA 1982) ("We note that the evidence in question was by deposition and that our vantage point in interpreting the deposition is not inferior to that of the [hearing officer].").

We in turn look at the record evidence and consider whether the ALJ's findings and conclusions based on that evidence "accord[] with logic and reason." *U.S. Cas. Co. v. Maryland Cas. Co.*, 55 So. 2d 741, 745 (Fla. 1951); *Andrews v. C.B.S. Div., Maule Indus.*, 118 So. 2d 206, 211–12 (Fla. 1960) (requiring that a hearing officer explain how he viewed conflicting medical evidence "so that the reviewing authority may be able to determine whether the result accords with logic and reason-or to put it another way-whether the result is supported by 'competent, substantial evidence'"); *see also Gillespie v. Anderson*, 123 So. 2d 458, 463 (Fla. 1960) (rejecting hearing officer's conclusions for failing to meet the

11

"logic and reason" test because his order was "replete with findings of fact which are not only unsustained by competent substantial evidence, but are in conflict with the only evidence in the record relating to the facts purported to be found by the" hearing officer); *Thomas v. Salvation Army*, 562 So. 2d 746, 750 (Fla. 1st DCA 1990) (both concluding that the administrative hearing officer "failed to articulate a reasonable explanation for the rejection of [one doctor's] deposition testimony" and independently construing the testimony to conclude that the required causal connection had been demonstrated "within the standard of reasonable medical probability").

While we credit the ALJ for doing yeoman's work in sorting through documentary evidence numbering in the thousands of pages, we cannot say there is sufficient evidence in the record to support a logical and reasonable conclusion that W.K. is substantially, mentally impaired. The eighty-one-days-old assessments of W.K.'s functionality simply cannot support, without more, a conclusion about the extent of the child's mental impairment over two years later, especially in the light of the testimony from both sides' pediatric neurologists discussing their more recent assessments of W.K. firmly pointing in the other direction. The ALJ did not account for the intervening physical development and functionality of W.K. demonstrated by that closer-in-time testimony from the neurologists, which provided direct, recent observations and assessments of W.K. and logically seemed to undermine much earlier assessments of W.K.'s cognitive development. It also appears the ALJ did not adequately account for the special circumstances of the *Birnie* case and the rule it presupposed (that both elements of impairment must each be proved).

Notably, both pediatric neurologists who gave testimony were the only providers to speak to W.K.'s functionality at the time of the final hearing, and both intimated—if not outright stated—that W.K. was showing age-appropriate development with relatively mild limitations. The evidence showed, indisputably, that by the time of the final hearing, W.K. had considerable physical functionality and cognitive abilities—a showing that cried out for evidence of a *recent* assessment of W.K.'s cognitive abilities or his vocational and social development to demonstrate mental

impairment. That evidence was lacking; or, to the extent there was any, the ALJ certainly failed to rely on it. On *this* record—unlike the one in *Birnie*—there was an insufficient evidentiary basis from which the ALJ properly could infer mental impairment as a substitute for direct proof.

The ALJ's determination that W.K. was "substantially *mentally* . . . impaired" was not supported by "competent, substantial evidence in the record." (emphasis supplied). Because we reject NICA's arguments for why other determinations made by the ALJ lacked evidentiary support, while we set aside the order insofar as it determines that W.K. qualifies for compensation under the Plan, we remand for further proceedings only on the question of whether W.K. is "substantially mentally . . . impaired," in addition to being "substantially . . . physically" impaired, such that W.K. could be proven to have suffered a BRNI, as it is defined under the Plan.

SET ASIDE; REMANDED for further proceedings.

OSTERHAUS, C.J., and RAY, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

J. Stephen Menton, Stephen A. Ecenia, and Tana Storey of Rutledge Ecenia, P.A., Tallahassee, for Appellant.

Gregory Anderson, Jennifer C. Anderson and Nicholas Whitney of AndersonGlenn LLP, Jacksonville, for Appellees.