788 So.2d 1010 (2001)
Tracy A. FLUET, as parent and natural guardian of Tano Niles Jokela, a deceased minor, Appellant,
v.
FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION ASSOCIATION, Appellee.
No. 2D00-914.
District Court of Appeal of Florida, Second District.
March 7, 2001.
Jon C. Kieffer of Kieffer & Rahter, P.A., St. Petersburg, for Appellant.
Arthur J. England, Jr., and Paul C. Savage of Greenberg Traurig, P.A., Miami, for Appellee.
ALTENBERND, Judge.
Tracy A. Fluet, the mother of a deceased infant, sought compensation from the Florida Birth-Related Neurological Injury Compensation Association (NICA). The administrative law judge denied the *1011 claim, concluding that no obstetrical services were delivered by a participating physician at the birth. We reverse. A physician who authorizes the use of Pitocin during a delivery of a child has "delivered" obstetrical services, even if he or she is not present in the delivery room.
Ms. Fluet was admitted to Morton Plant Hospital on June 12, 1995, for an anticipated normal delivery of a child by the hospital's nurse midwifery services. The hospital had a protocol for certified nurse midwives[1] that required the nurse midwife to be under the supervision of an attending obstetrical physician, to whom the nurse midwife was responsible, and who would be readily available for consultation and medical direction. During Ms. Fluet's delivery, a nurse midwife noted that Ms. Fluet's contractions were hypotonic, that is, insufficient to accomplish the birth of the baby. As a result, the nurse midwife concluded that Pitocin should be administered. The nurse midwife was not permitted to administer Pitocin without the authorization of her supervising physician. Accordingly, the nurse midwife called the attending doctor on the telephone and described the circumstances to him. He authorized the nurse midwife to administer Pitocin.
Thereafter, the nurse midwife delivered Ms. Fluet's child, but the child was in very grave condition. The child died within four days. The autopsy and death certificate indicated that the child died of respiratory failure, due to apnea, as a consequence of hypoxic ischemic encephalopathy.
Ms. Fluet filed a claim for compensation under the Florida Birth-Related Neurological Injury Compensation Plan. §§ 766.303(1), .305, Fla. Stat. (1999). This statutory plan provides an exclusive nofault benefit in lieu of the claimant's traditional common law tort rights. See § 766.303(1), (2); Florida Birth-Related Neurological Injury Compensation Ass'n v. McKaughan, 668 So.2d 974, 977 (Fla. 1996). The legislature created this plan to protect physicians from the skyrocketing malpractice insurance premiums paid by obstetricians and to assure that Floridians would have an adequate supply of these essential health services. See ch. 88-1, § 60, Laws of Fla.; § 766.301(1)(a), (c), Fla. Stat. (1999). See also David M. Studdert, et. al., The Jury is Still In: Florida's Birth-Related Neurological Injury Compensation Plan After a Decade, 25 J. Health Pol. Pol'y & L. 499 (June 2000). Although the benefit paid under the plan is more restricted than the remedies provided by tort law, the plan does not require the claimant to prove malpractice and provides a streamlined administrative hearing to resolve the claim. See McKaughan, 668 So.2d at 977.
To establish a claim, the petitioner must prove that the child's injury is a "birth-related neurological injury," and that
... obstetrical services were delivered by a participating physician in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital; or by a certified nurse midwife in a teaching hospital supervised by a participating physician in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital.
§ 766.309(1)(b), Fla. Stat. (1999). See also § 766.31, Fla. Stat. (1999).[2]
In this case, Morton Plant Hospital was not a teaching hospital. In addition, the nurse midwives in this case had not paid assessments to NICA. If they had, they would be treated like "participating physicians" *1012 because they were "supervised by a participating physician." See § 766.314(4)(c), Fla. Stat. (1999).[3] Thus, the parties agreed that Ms. Fluet could not invoke the plan based on the delivery of obstetrical services by the nurse midwives. The doctor who authorized the administration of the Pitocin over the telephone, however, was a participating physician. Thus, the specific issue before the administrative law judge was whether that doctor "delivered" obstetrical services "in the course of" this "delivery" of a baby.
The administrative law judge ruled that the doctor had not "delivered" such services. We conclude that the administrative law judge erred as a matter of law. The administrative law judge interpreted the statute to require the participating physician to "deliver" a baby, rather than to "deliver" obstetrical services in the course of the "delivery" of a baby. Moreover, the administrative law judge mistakenly concluded that the language in section 766.314(4)(c), which treats a participating nurse midwife like a participating physician, prevented a physician who supervised a nonparticipating midwife from "delivering" services during the delivery of the baby.
Section 766.309(1)(b) does not define the term "delivered." The administrative law judge equated the "delivery of services" with the "delivery of a baby." In the context of the statute, however, the obstetrical services are "delivered" during an obstetrical "delivery." "Delivered" is not used as a medical term, but as a commercial term. The obstetrical services are "delivered" or provided in the same sense that legal services or accounting services are "delivered."
In interpreting this statute, we are guided not only by the plain language of the statute, which distinguishes in the same sentence between "delivered" services and "delivery" of a baby, but also by the purpose of the legislation. See White v. Florida Birth Related Neurological Injury Compensation Ass'n, 655 So.2d 1292, 1296 n. 1 (Fla. 5th DCA 1995) (holding plain language of statute will not be disturbed absent ambiguity or conflict); Florida Birth-Related Neurological Injury Compensation Ass'n v. Florida Div. of Admin. Hearings, 686 So.2d 1349, 1354 (Fla.1997) (holding legislative intent is polestar by which court must be guided in interpreting statutes).[4] The purpose of the statutory plan is to limit a participating physician's exposure to civil liability in cases where the doctor's professional involvement could make him or her a defendant in a lawsuit. Nothing in the language of this Act suggests that it is limited in its scope to obstetricians who are physically *1013 present in the delivery room and not to those whose professional service is delivered in other ways. Indeed, a consultation like the one held in this case may expose a physician to liability if negligently performed. See, e.g., Tysinger v. Smisson, 176 Ga.App. 604, 337 S.E.2d 49 (1985).[5]
The involvement of a nurse midwife in this case tends to unnecessarily confuse the analysis. Section 766.314(4)(c) provides, in part, that a nurse midwife may become a "participating physician" if supervised by a participating physician.[6] The act of supervising under the statute is merely a requirement to place the midwife within the Act. Nothing in the language of the Act suggests that this requirement prevents a supervising and participating physician from also delivering obstetrical services in a delivery of a baby performed primarily by a midwife. Hypothetically, if the participating physician had been called by a nonparticipating physician for a consult about the decision to administer Pitocin, the legal issue would be the same, without the confusion created by the involvement of the midwife and section 766.314(4)(c). The plan clearly intends to protect physicians who are sued for such involvement in the "course of ... delivery." § 766.309(1)(b).
In this case, the patient received Pitocin because of the action and the decision of a physician. That action, if negligently performed, could expose the physician to liability. If a prescription drug can be delivered to the patient only upon the authorization of a physician, we conclude that the participating physician who authorizes such an obstetrical drug has "delivered" this obstetrical service.
Reversed and remanded for proceedings consistent with this opinion.
PARKER, A.C.J., and BLUE, J., concur.
NOTES
[1] See ch. 467, Fla. Stat. (1999), the "Midwifery Practice Act."
[2] The administrative law judge bifurcated these two issues and heard evidence regarding only whether obstetrical services were delivered by a participating physician. Therefore, the administrative law judge made no finding as to whether the injury suffered by the infant was a "birth-related neurological injury."
[3] Section 766.314(4)(c), Florida Statutes (1999) provides, in part:

Participating physicians include any certified nurse midwife who has paid 50 percent of the physician assessment required by this paragraph and paragraph (5)(a) and who is supervised by a participating physician who has paid the assessment required by this paragraph and paragraph (5)(a). Supervision shall require that the supervising physician will be easily available and have a prearranged plan of treatment for specified patient problems which the supervised certified nurse midwife or physician may carry out in the absence of any complicating features.
[4] We recognize that NICA also invokes the rule that statutes in derogation of common law must be strictly construed to preserve common law rights. See Florida Birth-Related Neurological Injury Compensation Assoc. v. Florida Div. of Admin. Hearings, 686 So.2d 1349, 1354-55 (Fla.1997). Nevertheless, NICA's argument, which the administrative law judge accepted, is an incorrect reading in conflict with the legislative intent, not a narrow reading. Ironically, in this case it is Ms. Fluet's common law rights that are restricted, yet she reads the plan more expansively than NICA reads it.
[5] Nothing in our record suggests that the decision to administer Pitocin was negligent or that the administration of the drug was the proximate cause of the infant's death. Because the Plan is based upon a no-fault system, this was not an issue addressed by the parties or the administrative law judge.
[6] The legislative decision to protect nurse midwives under this plan only if they are supervised by a participating physician may have many explanations. For example, because the Act is designed to minimize the insurance premiums paid by obstetrical physicians, it is likely that the legislature concluded that unsupervised midwives had little, if any, impact upon the premiums paid by obstetricians.