865 So.2d 561 (2004)
ADVENTIST HEALTH SYSTEM/SUNBELT, INC., etc., Appellant,
v.
FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY etc., et al., Appellees.
No. 5D02-892.
District Court of Appeal of Florida, Fifth District.
January 2, 2004.
Rehearing Denied February 18, 2004.
*562 Robert A. Hannah, Christopher C. Curry and Robin D. Black, of Hannah, Estes & Ingram, P.A., Orlando, and Raymond T. Elligett, Jr., of Schropp, Buell & Elligett, P.A., Tampa, for Appellant.
Thomas E. Dukes, III, of McEwan, Martinez & Dukes, P.A., Orlando, for Intervenors, Michael Geiling, D.O. and Mid-Florida OB/GYN Specialists, Inc.
Pierre J. Seacord and Gregory M. Krak, of Ringer, Henry, Buckley & Seacord, P.A., Orlando, for Intervenor, Juan Ravelo, M.D.
John Elliott Leighton, Patricia M. Kennedy, of Leesfield, Leighton, Rubio, Mahfood & Boyers, P.A., and Jay M. Levy, of Jay M. Levy, P.A., Miami, and Lora A. Dunlap, of Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, P.A., Orlando, for Appellees, Sandra Shoaf and James Shoaf.
Wilbur E. Brewton and Kelly B. Plante, of Roetzel & Andress, L.P., Tallahassee, for Appellee, Florida Birth-Related Neurological Injury Compensation Association.

ON MOTION FOR REHEARING EN BANC
GRIFFIN, J.
Upon motion of appellees, we have elected to rehear this case en banc. After consideration of the briefs and en banc oral argument, we withdraw the prior panel opinion and issue the following en banc opinion in its stead.
The Adventist Health System/Sunbelt, Inc., d/b/a Florida Hospital-Altamonte ["Florida Hospital"], and intervenors, Michael Geiling, D.O., Juan Ravelo, M.D., and Mid-Florida OB/GYN Specialists, Inc., appeal an order issued by an administrative law judge ["ALJ"] finding that Raven Shoaf ["Raven"] was not subject to compensation under the Florida Birth-Related Neurological Injury Compensation Plan ["the plan"], because she was not permanently and substantially "mentally impaired" within the meaning of the plan. Appellants contend that, based on certain undisputed facts, she was permanently and substantially mentally impaired as a matter of law. We disagree and affirm.
Raven was born at Florida Hospital in Altamonte Springs, Florida, on November 28, 1997. She was deprived of oxygen *563 during birth and sustained serious injuries. Her parents, Sandra and James Shoaf ["the Shoafs"], filed an action for medical negligence in Seminole County circuit court against Florida Hospital, as well as Geiling and Ravelo, the two physicians who provided obstetrical services to Raven's mother, and Mid-Florida OB/GYN Specialists, Inc. Both obstetricians were "participating physicians" under the plan and the hospital was a participating hospital, but the Shoafs did not file or pursue a claim for benefits under the plan.
The Florida Birth-Related Neurological Injury Compensation Association ["NICA"] intervened in the circuit court action, claiming that Raven's injuries were subject to the plan. The circuit court abated the action and required the Shoafs to file a petition with the Division of Administrative Hearings to resolve whether Raven was covered by the plan. The NICA statute defines "birth-related neurological injury" to mean an injury which, among other things, renders the infant both "permanently and substantially mentally and physically impaired." § 766.302(2), Fla. Stat. (1995).[1] (Emphasis added.) The Shoafs' position was that Raven did not meet the criteria for coverage under the plan because, although she had suffered significant physical impairments, she had not sustained a permanent and substantial mental impairment.
A two-day hearing was held before an ALJ, principally to resolve the issue of mental impairment.[2] The evidence adduced at the hearing showed that Raven had significant and severe physical injuries due to oxygen deprivation. It was essentially undisputed that she has cerebral palsy, which refers to a group of motor disorders caused by an injury to the developing brain. Also, Raven's CAT scans and MRI's showed that she had sustained various permanent injuries to her brain. Her imaging studies show that she has damage to both sides of the basal ganglia and thalamus. There was also damage to the white matter surrounding the basal ganglia (which acts as insulation), the hippocampi, both frontal lobes, both parietal lobes, the corpus callosum, and the cerebral cortex. Most witnesses testified these injuries were diffuse (i.e.selective), as opposed to global in nature.[3] Her physical injuries include both spasticity and stiffness; when she tries to move, her body goes in the opposite direction and she gets posturing, as well as a wiggly movement. She is unable to walk or talk and has problems holding her head up and directing her gaze. She can crawl or sit up only with assistance. She cannot reach out and hold objects. She is unable to eat by mouth and must wear a diaper. Statistically, a little less than one-half of the children who present with cerebral palsy, *564 as Raven does, are not cognitively impaired.
The dispute in this case concerns whether Raven has a permanent and substantial "mental impairment" in addition to the cerebral palsy. The parents presented several witnesses, including several physicians, Raven's speech therapist and an occupational therapist, who testified that, despite her physical impairments and the damage shown on the scans, Raven is of normal or above-average intelligence, and can demonstrate that intelligence in many ways. These expert witnesses all agreed that Raven was not "mentally impaired" as a result of her injuries. One witness even testified that Raven may eventually be able to attend classes in a normal classroom, although she may have to have substantial assistance with such things as going to the bathroom and using her feeding tube. These physicians explained that some children with abnormal MRI's and scans can still be very bright, in part due to "plasticity," which refers to the ability of the brain of a young child to rewire itself to take on functions that normally would have been assigned to another part of the brain. Witnesses testifying that Raven had normal cognitive functioning attributed her difficulties in communication to her physical problems. This testimony is outlined in detail in the final order in support of the ALJ's finding that Raven was not "permanently and substantially mentally impaired" within the meaning of the plan. Many of these witnesses had contact with Raven on an ongoing basis, a fact important to the ALJ.
By contrast, witnesses presented by NICA and the intervenors testified that Raven has an I.Q. as low as twenty or thirty due to her injuries and that she has no understanding of the world around her. One of these experts even characterized the belief that Raven was responsive as being nothing more than her parents' wishful thinking.
In the ALJ's forty-nine page order exhaustively reviewing the evidence presented by the parties, along with the reports presented by their experts, the ALJ explained his evaluation of the evidence presented to him. He found that Dr. Duchowny, the pediatric neurologist who opined that Raven had no awareness of the world around her, had examined Raven only for one-half an hour when she was three-and-one-quarter years of age, and his findings conflicted with observations made by her parents. Dr. Waters, who found Raven's cognitive deficit "significantly large," also performed a relatively cursory examination, but even she had detailed in her report some responses made by Raven to various stimuli and testing. By contrast, Dr. Brunstrom, who had found that Raven was "cognitively intact," had examined her on three occasions for a total of nearly eight hours, and the judge quoted extensively from the report, detailing Raven's responses. He also noted that two other pediatricians with special qualifications in child neurology and a board certified clinical neuropsychologist, expressed opinions consistent with Dr. Brunstrom's and each had examined Raven for approximately two hours. The judge concluded that those witnesses who testified that Raven was cognitively intact were "well qualified and positioned" to evaluate Raven, while those who testified on behalf of the intervenors were not. Based on his evaluations of the evidence, the judge concluded that NICA and the intervenors had failed to sustain their burden of proving that Raven is mentally impaired within the meaning of the plan:
The medical records and other proof, including the testimony of the various healthcare providers and the videos offered by the parties have been carefully *565 considered. So considered, it must be resolved that the proof does not permit a conclusion to be drawn, with any sense of confidence, that, more likely than not, Raven is permanently and substantially mentally impaired.
Notwithstanding the evidence adduced at the hearing and the ALJ's factual findings, appellants' position, simply put, is that Raven was permanently and substantially mentally impaired as a matter of law. For this contention, they rely on Florida Birth-Related Neurological Injury Compensation Ass'n v. Florida Div. of Admin. Hearings, 686 So.2d 1349, 1354 (Fla.1997) [the "Birnie" decision].
The Birnie case involved injuries apparently similar to those sustained by Raven in this case. As a result of birth-related events causing oxygen deprivation, Eric Birnie suffered a focal injury to the basal ganglia, an area of the brain which aids the body in performing "physical functions." Despite severe physical limitations, testing indicated that Eric was average or even above average in his cognitive skills. Eric's parents nonetheless sought compensation under the plan, claiming that he was "mentally impaired" within the meaning of section 766.302(2), Florida Statutes (1991). NICA denied coverage, and a hearing was held to determine whether Eric's injury was covered by the plan. Key among the findings of fact made by the Birnie ALJ was:
44. Eric is indisputably permanently and substantially physically impaired. Respondent contends, however, that Eric and his parents are not entitled to compensation under the NICA Plan because he is not substantially mentally impaired. This issue is addressed in more detail in the Conclusions of Law below. As noted above, Eric's condition is the result of damage to his brain. As a direct result of his injury, Eric will not be able to communicate, attend school or otherwise learn and develop intellectually without substantial accommodation. His social and vocational development have unquestionably been significantly impaired.
Id. at 1352-1353. In Birnie, the hearing officer rejected the argument that mental impairment should be equated with cognitive functioning. He instead focused on the special accommodations necessary for Eric to develop intellectually and the social and vocational limitations on the child as a result of his injury. The judge found:
61. In sum, it is concluded that, as a direct result of his brain injury and consequent physical limitations, Eric will not be able to translate his cognitive capabilities into adequate learning in a normal manner. Moreover, as a direct consequence of his injuries, Eric's social and vocational development have been drastically impaired. Consequently, it is concluded that Eric is permanently and substantially mentally and physically impaired and that Eric has suffered a "birth-related neurological injury," within the meaning of Section 766.302(2), Florida Statutes. Accordingly, the subject claim is compensable under the NICA Plan. Sections 766.302(2), 766.309(2), and 766.31(1), Florida Statutes. This interpretation furthers the legislative intent to provide compensation to a limited class of catastrophically injured infants on a no-fault basis to help alleviate the malpractice insurance crisis facing physicians practicing obstetrics.
Id. at 1353 (footnote omitted) (emphasis added). Additional findings were made by the ALJ which were omitted from the supreme court's opinion, but which are available to this court because the Birnie case was initially decided here. See Florida Birth-Related Neurological Injury *566 Comp. Ass'n v. Florida Div. of Admin. Hearings, 664 So.2d 1016 (Fla. 5th DCA 1995). The ALJ expressed doubt about the reliability of intelligence tests given to children under the age of five (Eric was three years and ten months old when tested), especially when the child has physical limitations as severe as Eric's. He further noted that "it is impossible to determine whether and to what extent Eric's level of intelligence and/or his perceptual and processing abilities have been reduced by the injury to his brain, regardless of what his test scores show at this time." He determined that the results of the intelligence tests should not be given undue weight in deciding whether Eric is substantially mentally impaired. He explained: "Instead, the nature, extent and implications of Eric's injury should all be taken into account in determining whether Eric has been permanently and substantially physically and mentally impaired." He also relied on his own meeting with Eric:
60. Eric was present and testified at the hearing in this matter. While he appears to be a happy, charming little boy, it is extremely difficult to understand any of his utterances and he has to pause to gather his thoughts and/or his strength while he is attempting to communicate. Eric has virtually no independent mobility. It is obvious that Eric has suffered a catastrophic injury. The severity of Eric's physical limitations will greatly restrict his ability to interact with others, to attend school and to otherwise develop in a normal manner. As a consequence, Eric's ability to achieve the milestones and develop the skills that would enable him to be socially, educationally and intellectually competitive has certainly been impaired. Without question, his occupational opportunities have been drastically affected. The contention that Eric is not "mentally impaired" ignores the totality and pervasiveness of his injury. The results of an intelligence test are only a limited measure of one aspect of mental functioning. Such results should not be given conclusive weight over a consideration of the totality of the impact of the injury on the victim. While Eric's IQ test may be within normal ranges under certain special conditions, Eric will never be able to test within the "normal" range if the tests are administered in a "normal" manner nor will he be able to develop and use his cognitive ability in a normal way.
The Birnie ALJ then noted that the term "mentally impaired" is not defined in the NICA statute nor is there any delineation of the conditions this term encompasses. He relied on cases discussing "mental impairment" or "mental inability," that suggested various meanings, including mental weakness, deterioration or damage or any condition which weakens, diminishes, restricts or otherwise damages an individual's mental activity, not limited solely to intellectual or educational attainment.
He concluded that the term "mentally impaired" should be interpreted in accordance with the purpose of the NICA legislation after consideration of all the circumstances involved in a case. His evaluation of all the evidence presented to him caused him to conclude that Eric was "permanently and substantially mentally impaired."
NICA appealed the determination that Eric was entitled to compensation. This court affirmed, concluding that the plan did not intend to differentiate between mental and physical impairment, but was intended to cover an infant if there was substantial impairment, either mental or physical. Id. at 1021.
NICA then appealed to the Supreme Court of Florida, which rejected this court's interpretation of the plan, and *567 found that the plain language of the statute required both mental and physical impairment. At the close of the opinion, the Supreme Court of Florida approved the hearing officer's conclusion that Eric had sustained both mental and physical impairment within the meaning of the plan, briefly explaining:

We are left with the hearing officer's findingwhich is properly predicated on a reading of the statute in the conjunctivethat Eric Bernie is "permanently and substantially mentally and physically impaired and ... has suffered a `birth-related neurological injury' within the meaning of section 766.302(2)." Having thoroughly reviewed the record and the hearing officer's final order, we conclude that it is supported by competent and substantial evidence. Consequently, we disapprove the opinion below to the extent that it misconstrues the plain language of the statute, but approve the result, and direct that the case be remanded to DOAH for a determination of the amount of compensation Eric is entitled to under the NICA Plan.
686 So.2d at 1356.
Appellants construe the above-quoted passage from the Birnie decision to create the definition of "substantial mental impairment" as this phrase is used in NICA. According to appellants: "The Birnie decision added to the definition of substantial mental impairment by effectively adding a requirement that the child be able to translate any cognitive capabilities into adequate learning in a `normal manner.' " It is apparent, however, that the Birnie court did not define or redefine "substantial mental impairment." They simply said that the decision of the ALJ was supported by competent evidence. All this language in Birnie suggests is that, under NICA, the identification of a substantial mental impairment may include not only significant cognitive deficiencies but can include, in a proper case, additional circumstances such as significant barriers to learning and social development.
Appellants urge that, although Raven's brain injuries have not resulted in cognitive impairment, in the sense that they do prevent Raven from learning or thinking, they must, as a matter of law, constitute a "mental impairment" within the meaning of the plan because, like Eric Birnie, she will require substantial accommodation in order to translate normal cognitive capabilities into learning. Apart from the evidence adduced and the findings made in this case, there are many other problems with this position. First, as a definition, it is not the plain and ordinary meaning of the undefined statutory term. The Birnie court made clear that the plain and ordinary meaning of these terms should be applied. 686 So.2d at 1354. Second, it violates the definitional framework approved by the supreme court in Birnie:
`The Statute is written in the conjunctive and can only be interpreted to require permanent and substantial impairment that has both physical and mental elements.'
Id. at 1356. To say that physical disabilities that impede the cognitive and social development of a child alone are enough to constitute a mental impairment violates the dichotomy identified by the high court in Birnie. If this were the true definition of "substantial mental impairment," then seemingly most children with cerebral palsy would be classifiable as "substantially mentally impaired," although the evidence indicates that cerebral palsy and mental defect are two separate injuries. There was expert testimony that children with oxygen deprivation injuries "can be physically disabled, yet be intellectually preserved." Cerebral palsy is a motor injury *568 which occurs when the circuits in the brain that control movement are damaged, while cognitive injury or impairment occurs when circuits relating to memory or learning are impaired. Furthermore, according to the testimony, oxygen deprivation or hypoxia first attacks those areas of the brain which control motor function, and only secondarily results in damage to mental function.
The Shoafs point out that the interpretation of "mental impairment" urged by appellants in this case contravenes the principle that:
because the [NICA] Plan, like the Worker's Compensation Act, is a statutory substitute for common law rights and liabilities, it should be strictly construed to include only those subjects clearly embraced within its terms ... [and] a legal representative of an infant should be free to pursue common law remedies for damages resulting in an injury not encompassed within the express provisions of the Plan.
686 So.2d at 1354, quoting Humana of Florida, Inc. v. McKaughan, 652 So.2d 852, 859 (Fla. 2d DCA 1995) (citation omitted). Because the legislature chose not to define the terms used in the test for NICA qualification, these terms are to be given their ordinary meanings.[4]Id. The legislature left the application of the terms they used to the administrative law judges designated by statute to hear these claims and to apply the expertise they develop in carrying out this task to determine from the evidence adduced in each case whether the test for NICA is met.
The dissent expresses concern that our decision condones different outcomes on identical facts. First, nothing suggests that the facts of these two cases are identical. Eric Birnie and Raven Shoaf are two very different individuals. There are certainly similarities in the injury and in the consequent physical impairments. Most important, for purposes of our decision, the Shoafs acknowledge that there was testimony below that, like Eric Birnie, Raven's physical impairments will require accommodation for verbal communication, schooling and other life activities, even though the testimony was conflicting as to degree.
Courts have always recognized that different juries may reach a different result on similar facts. See e.g., Middleton v. Evatt, 855 F.Supp. 837, 840 (D.S.C.1994). It is common for us to see, for example, that juries have awarded significantly different sums for apparently identical injuries. We similarly see different outcomes when the fact finder is asked to determine whether a particular injury is "permanent" or "not permanent." These differences *569 arise not because we have an "unprincipled, incoherent system" but because such differences can arise in a principled and coherent system where every individual is guaranteed an opportunity to lay his own case before an impartial arbiter of the facts. In most cases, this is a jury. In cases such as the one before us, the ALJ, as fact finder, brings his own background, training, experience and expertise to the task of weighing and evaluating very sophisticated evidence. The child's advocate likewise brings his own communication and strategic skills to the fact-finding process; and finally, the evidence in each case will vary in its power to persuade. This will be especially true in cases where the opinions of experts are considered. In Birnie, for example, the ALJ did not appear to be persuaded by the evidence offered to him by NICA of the level of Eric's intellect and ability to function. We don't know why; perhaps the evidence wasn't very good, or perhaps it wasn't well presented. In any event, it is clear that other facts, and other evidence, including his personal encounter with Eric, persuaded Eric's ALJ to come to a different conclusion than the ALJ who heard the evidence offered by the Shoafs. In each case, the ALJ appears to have attempted to apply the plain and ordinary meaning of the term "substantial mental impairment" to his evaluation of the evidence. The term is broad enough to encompass more than just damage to cognitive capacity, contrary to appellees' argument, and more than merely the inability to "translate cognitive capabilities into adequate learning in the normal manner" or "impairment of social and vocational development," as urged by appellants.[5] Both the ALJ in the Birnie case and the ALJ in this case appear to have understood this and to have done their job conscientiously.
Finally, as judges, we learn, early on, that there are always fact situations at the margins where it is very difficult to determine the side of a line on which a particular decision will fall. That is one reason why our review is limited to whether the decision was supported by substantial competent evidence.
The Birnie ALJ considered the evidence given to him, weighed its credibility and reached a decision about Eric. Likewise, the ALJ in this case considered the evidence given to him, weighed its credibility and made a decision about Raven. Each judge weighed the evidence he was given and reached a result that the evidence supported. The fact that they were different results, even though certain of the evidence was similar, does not make one decision wrong and the other right. Evidence that can support a fact-finder's conclusion is far different from evidence that compels a particular conclusion.
In affirming the ALJ's decision in this case, we have done exactly what the high court did in Birnie. We have looked to see whether competent evidence supports the ALJ's decision. Otherwise, Raven Shoaf and all other similarly injured Florida *570 children will have no right to an individualized determination of mental impairment, but will be bound by the work of the lawyers for Eric Birnie, whose goal was to show that he was mentally impaired. Appellants bore the burden of persuasion in this case that Raven was "substantially mentally impaired" and its evidence was not persuasive to the finder of fact.
AFFIRMED.
PETERSON, THOMPSON, PALMER, ORFINGER and MONACO, JJ., concur.
SAWAYA, C.J., concurs and concurs specially, with opinion, in which PALMER, J., concurs.
TORPY, J., concurs specially, with opinion.
SHARP, W., J., dissents, with opinion.
PLEUS, J., dissents, with opinion, in which SHARP, W., J., concurs.
SAWAYA, C.J., concurring and concurring specially.
I concur in the well-reasoned majority opinion. I write to explain why I believe, based on the pertinent statutory provisions that govern awards under the Florida Birth-Related Neurological Injury Compensation Plan (the Plan), that affirmance is required in this case.[1] I also write to explain why I disagree with Appellant's assertion that the central issue in the instant casewhether the infant is substantially and permanently mentally impairedis an issue of law. Additionally, I feel compelled to explain why I disagree with the argument advanced in the dissenting opinion that the courts should formulate a legal standard to be applied by the administrative law judge (ALJ) in determining whether an infant has sustained a substantial mental impairment.
Based on my analysis of the pertinent statutory provisions, I conclude that: 1) the ALJ's finding that the infant is not mentally impaired is purely a factual finding that is supported by substantial competent evidence; 2) this finding is conclusively binding on this court; and 3) the decision in Florida Birth-Related Neurological Injury Compensation Ass'n v. Florida Division of Administrative Hearings, 686 So.2d 1349 (Fla.1997) (hereinafter "Birnie"), does not, as Appellant seems to argue, convert this issue of fact into an issue of law. Hence, in my view, this court has no alternative but to affirm the decision of the ALJ denying compensation under the Plan to the infant. Each of these conclusions shall be discussed in the following sections.

The Finding That the Infant is Not Substantially and Permanently Mentally Impaired is a Factual Finding Supported by Substantial Competent Evidence
In order to obtain compensation under the Plan, the injured infant must sustain a "birth-related neurological injury." In section 766.302(2), the Legislature provides the following definition:
"Birth-related neurological injury" means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams for a single gestation or, in the case of a multiple gestation, a live infant weighing at least 2,000 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently *571 and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.
(Emphasis added).
In the instant case, the ALJ specifically found that the infant did not sustain a compensable injury because, although the infant was substantially physically impaired, the infant was not substantially mentally impaired. In my view, the pertinent statutory provisions that make up the Plan clearly establish that this is a finding of fact to be determined by the ALJ.
I find of particular importance section 766.309(1)(a), which provides in pertinent part that:
The administrative law judge shall make the following determinations based upon all available evidence: Whether the injury claimed is a birth-related neurological injury.
(Emphasis added). This statute also provides that a presumption arises that the injury is a birth-related neurological injury as defined in section 766.302(2) "[i]f the claimant has demonstrated, to the satisfaction of the administrative law judge, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury and that the infant was thereby rendered permanently and substantially mentally and physically impaired ...." § 766.309(1)(a), Fla. Stat. (2002) (emphasis added). In my view, these statutory provisions clearly establish that the issue whether an infant was substantially permanently physically and mentally impaired is a pure question of fact to be resolved by the ALJ. It is neither an issue of law nor a mixed issue of law and fact, contrary to the dissent's argument.
I find further support for my conclusion that this is a factual issue from decisions that have addressed the issue whether an injured plaintiff suffered an injury that satisfies the permanency threshold under section 627.737(2). This court has consistently held that the issue whether the plaintiff suffered a permanent injury is an issue of fact for the jury to resolve. See Wright v. Ring Power Corp., 834 So.2d 329, 331 (Fla. 5th DCA) ("[T]he issue of whether a plaintiff has sustained a permanent injury is generally one for the jury.") (quoting Tolivert v. Estate of Scherer, 715 So.2d 358 (Fla. 5th DCA 1998); Laberge v. Vancleave, 534 So.2d 1176 (Fla. 5th DCA 1988), review denied, 545 So.2d 1369 (Fla. 1989)), review denied, 846 So.2d 1148, 2003 WL 21310687 (Fla.2003). Other courts adopt the same general rule. McElroy v. Perry, 753 So.2d 121 (Fla. 2d DCA 2000); Evans v. Montenegro, 728 So.2d 270, 271 (Fla. 3d DCA) ("Permanency determinations are generally made by juries."), review denied, 741 So.2d 1135 (Fla.1999); Kwader v. Pandolfo, 711 So.2d 1382 (Fla. 5th DCA 1998); Wolski v. Clark, 746 So.2d 466, 467 (Fla. 2d DCA 1997) ("Since reasonable minds could differ as to whether Mr. Clark sustained a permanent injury as the result of the accident, a question of fact existed which should have been submitted to the jury for its consideration.") (citation omitted); State Farm Mut. Auto. Ins. Co. v. Orr, 660 So.2d 1061 (Fla. 4th DCA 1995); Ketchen v. Dunn, 619 So.2d 1010 (Fla. 2d DCA 1993).
In cases involving the issue of permanency under section 627.737(2), the jury is instructed to determine by "the greater weight of the evidence" whether the plaintiff suffered significant and permanent loss of an important bodily function, significant and permanent scarring or disfigurement, or a permanent injury. Fla. Std. Jury Instr. (Civ.) 6.1(d). The comments appended to this standard jury instruction indicate that definitions are not necessary *572 because these issues are factual issues to be resolved by the jury based on the evidence presented.
I, therefore, reject the arguments advanced by Appellant and the dissent that this court should formulate a definition of the term "substantial and permanent mental impairment" or that this court should promulgate a legal standard to determine whether an infant has sustained a substantial and permanent mental impairment. It is abundantly clear that the Legislature has expressed its intention that the ALJ determine this factual issue based on all of the evidence which, of necessity, includes medical expert testimony, much like juries are required to do in personal injury cases. Like the majority, I also reject the notion that the court in Birnie established a definition of, or legal standard for, substantial mental impairment that has become binding precedent in all future cases involving infants with similar injuries. Had the court done so, it certainly would have violated its own admonition that "it is a basic principle of statutory construction that courts `are not at liberty to add words to statutes that were not placed there by the Legislature.'" Seagrave v. State, 802 So.2d 281, 287 (Fla.2001) (quoting Hayes v. State, 750 So.2d 1, 4 (Fla.1999)); see also Woodham v. Blue Cross & Blue Shield of Fla., Inc., 829 So.2d 891, 899 (Fla.2002) (quoting Seagrave). Perhaps a definition or legal standard may be of some benefit in certain cases. However, it is the prerogative of the Legislature, not the courts, to formulate the definition or standard and incorporate it into the statutory provisions that govern awards under the Plan.

Findings of Fact Supported by Substantial Competent Evidence are Conclusively Binding on This Court
"A determination of the administrative law judge as to qualification of the claim for purposes of compensability ... shall be conclusive and binding as to all questions of fact." § 766.311(1), Fla. Stat. (2002). An appellate court must affirm the findings of fact if they are supported by competent substantial evidence, and the court may not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. See § 120.68(7), (10), Fla. Stat. (2002); Nagy v. Florida Birth-Related Neurological Injury Comp. Ass'n, 813 So.2d 155, 159 (Fla. 4th DCA 2002); Wallace Corp. v. City of Miami Beach, 793 So.2d 1134 (Fla. 1st DCA 2001); Carreras v. Florida Birth-Related Neurological Injury Comp. Ass'n, 665 So.2d 1082, 1084 (Fla. 3d DCA 1995).[2] In Nagy, the court explained:
"A determination of the administrative law judge as to the qualification of the claim for purposes of compensability under s. 766.309 ... shall be conclusive and binding as to all questions of fact." § 766.311(1), Fla. Stat. (1997). An ALJ's findings of fact are reversible on appeal when they are not supported by competent substantial evidence in the record or where the agency's interpretation of the law is clearly erroneous. See § 120.68(7), (10), Fla. Stat. (1997); Carreras v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 665 So.2d 1082, 1084 (Fla. 3d DCA 1995).
813 So.2d at 159.
As I have previously discussed, the issue whether an infant has sustained a substantial *573 permanent mental impairment is a pure question of fact. Therefore, in my view, the determining factor is whether the ALJ's finding that the infant is not substantially mentally impaired is supported by substantial competent evidence in the record. If it is, then the ALJ's finding is conclusive and may not be disturbed by this court. The term "competent substantial evidence" has different meanings depending on the context in which it is used. See Florida Power & Light Co. v. City of Dania, 761 So.2d 1089 (Fla.2000); Florida Bd. of Med. v. Florida Acad, of Cosmetic Surgery, Inc., 808 So.2d 243 (Fla. 1st DCA 2002). When used in the context of fact-finding by an agency or ALJ, the term refers to a standard of proof. When used in the context of appellate review, as it is here, the term "substantial competent evidence" refers to a standard of review and equates to "legally sufficient evidence," which in essence means evidence that is "sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached." Florida Bd. of Med., 808 So.2d at 257 (quoting DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957)). "Pursuant to this standard, the reviewing body may not reweigh the evidence, make determinations regarding credibility or substitute its judgment for that of the agency, even if the record contains some evidence supporting a contrary view." Id. (citing Dunham v. Highlands County Sch. Bd., 652 So.2d 894, 896 (Fla. 2d DCA 1995); Panama City Hous. Auth. v. Sowby, 587 So.2d 494, 497 (Fla. 1st DCA 1991)).
I have reviewed the evidence and testimony in the instant case, which is thoroughly and succinctly discussed in the majority opinion, and, in my view, it is "sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached" by the ALJ that the infant is not substantially and permanently mentally impaired. Therefore, the ALJ's factual finding that the infant did not suffer a substantial mental impairment is supported by substantial competent evidence and is conclusive and binding on this court.

The Birnie Decision
As a premise to my discussion of the Birnie decision, I emphasize that the standard of review applicable to findings of fact is whether they are supported by substantial competent evidence in the record. Nagy. The standard of review that applies to the legal issues is whether the decision is clearly erroneous. Id. In Birnie, the Florida Supreme Court stated:
We are left with the hearing officer's findingwhich is properly predicated on a reading of the statute in the conjunctivethat Eric Bernie is "permanently and substantially mentally and physically impaired and ... has suffered a `birth-related neurological injury' within the meaning of section 766.302(2)." Having thoroughly reviewed the record and the hearing officer's final order, we conclude that it is supported by competent and substantial evidence.
686 So.2d at 1356 (emphasis added). The court in Birnie reviewed the finding that the infant suffered a substantial mental and physical impairment under the substantial competent evidence standard, which clearly indicates that the court considered this a factual finding and not an issue of law. The issue of law decided by the Birnie court was whether the infant must sustain both mental and physical impairment, and the court held that both injuries must be found in order to be compensable under the Plan.
Moreover, the Birnie court made it clear what issue it intended to resolve when it stated:

*574 This case presents this Court with a straightforward question of statutory interpretation and construction. That is, should the word "and," as used in the phrase "substantially mentally and physically impaired" in section 766.302(2) be read in the conjunctive, or must it be replaced with the word "or" and read in the disjunctive to remain consistent with the legislature's intent in enacting the NICA statute?
686 So.2d at 1353-54. That was the sole and exclusive issue resolved by the court in Birnie, and I reject Appellant's argument that the court established a legal standard to determine whether an infant is substantially and permanently mentally impaired. Had it intended to establish such a legal standard, the court surely would have analyzed the relevant statutory provisions that I have discussed and it would have explained why and how it could convert a factual issue the Legislature clearly intended to be resolved by the ALJ, based on all of the relevant evidence, into a legal issue.

Conclusion
I believe that the issue whether the infant is substantially and permanently mentally impaired is a purely factual issue to be decided by the ALJ based on all of the relevant evidence. I also believe that the factual finding by the ALJ that the infant is not mentally impaired is supported by competent substantial evidence in the record. Therefore, that factual determination is conclusive and binding an all of the parties and this court. In my view, this court has no alternative but to affirm the decision of the ALJ that the infant is not entitled to compensation under the Plan.
Finally, I totally reject the argument advanced by Appellant that the court in Birnie established a legal standard to determine whether an infant is substantially and permanently mentally impaired. For the court to have done so would be tantamount to rewriting legislation, which the judiciary is not permitted to do. If a definition or legal standard relating to mental or physical impairment under the Plan is to have any effect or meaning, it must be adopted by the Legislature. Therefore, in my view, the argument advanced by Appellant that the court did so in Birnie is a gross exaggeration of the holding in that case and is nothing more than an attempt to embroider that decision with a worthless trinket.
PALMER, J., concurs.
TORPY, J., concurring specially:
I reluctantly concur, but not due to any disagreement that I have with Judge Griffin's wellreasoned opinion. Rather, my reticence is based upon my belief that the legislature did not intend the result reached here today. However, given the language used in the statute and the dictates of Birnie, I do not believe that we can effectuate the intent of the legislature without overstepping our bounds. I suggest that the legislature look at the Virginia Statute and determine if that provides a more workable definition consistent with its intent.
SHARP, W., J., dissenting.
Had we been free in this case to write on a clear page, I might have agreed with the majority. The ALJ is the factfinder; his conclusions are supported by substantial and competent evidence. The NICA statute appears to require both permanent and substantial mental and physical impairment. § 766.302(2), Fla. Stat. The statute is clearly written in the conjunctive.
However, in my view, the Florida Supreme Court's opinion in Florida Birth-Related Neurological Injury Compensation *575 Ass'n. V. Fla. Div. Of Adm. Hearings, 686 So.2d 1349 (Fla.1977), the "Birnie" decision, added meat to the bones of that definition by affirming the conclusion of the ALJ in that casethat the infant in question was "both mentally and physically impaired" within the meaning of the statute. As noted in the majority opinion and Judge Pleus' dissenting opinion in this case, the child in that case, Eric Bernie, was brain damaged in a birth-related injury in a manner almost identical to Raven, the child in this case. Given the facts found in both cases, Eric was less severely damaged than Raven.
In spite of experts' testimony, which was accepted by the ALJ in Birnie, that Eric had average or above cognitive skills, the judge concluded that because of the physical damage to his brain resulting in severe physical limitations, "Eric will not be able to translate his cognitive capabilities into adequate learning in a normal manner," and that "Eric's social and vocational development have been drastically impaired." That, he concluded, amounts to a child who is "permanently and substantially mentally and physically impaired," under the NICA statutory definition. 686 So.2d at 1353. The Florida Supreme Court approved this interpretation of the statute. In my view, we are bound to follow this interpretation until either the Legislature or the Supreme Court changes the definition of a "birth-related neurological injury." § 766.302(2), Fla. Stat.
Equal justice under the law. That is a goal for which courts must strive. That is a goal missed here by this court's conclusion that Eric is a NICA baby, but Raven is not. Such disparity of treatment under the NICA law will, I agree with Judge Pleus, lead to a lack of uniformity of application, lack of guidance and precedent, and ultimately lack of respect for "the law."[1] Clearly, help is needed here. I hope it will come by the Florida Supreme Court's additional guidance and clarification, or by the Legislature taking another look at the definition of what they intended to cover as "birth-related neurological injuries" under the NICA statute. Right now, it is up for grabs.
PLEUS, J., dissenting.
The overall result of the majority decision will be to eliminate any meaningful standards in determining whether mental impairment exists under section 766.302(2), Florida Statutes. I therefore dissent.
It goes without citation that an administrative law judge's (ALJ) factual findings are to be sustained where supported by substantial competent evidence. However, that principle does not control the outcome of this appeal which instead concerns the application of a legal standard to the factual findings made by the ALJ. Thus, the ALJ's interpretation of the Plan must be reviewed de novo. Nagy v. Florida Birth-Related Neurological Injury Comp. Ass'n, 813 So.2d 155 (Fla. 4th DCA 2002); Fluet v. Florida Birth-Related Neurological Injury Comp. Ass'n, 788 So.2d 1010 (Fla. 2d DCA 2001).
The premise of the majority opinion is that application of the Act is purely a factual determination. This case does not involve solely findings of fact as the majority opinion would have you believe. The error lies in the application of an incorrect standard to factual findings. Because of this, I disagree. I also disagree that the sole test to be applied is whether the decision is supported by substantial competent evidence. That test is irrelevant if the ALJ applied the wrong legal standard.
*576 The failure of the Legislature to define "substantial mental impairment" in Chapter 766 does not mean that is entirely up to each ALJ to develop a definition of the term applicable to their particular case. Such a scheme results in an unprincipled, incoherent system in which some children fall within NICA, while other very similarly situated children are deemed to fall outside the Plan, solely because the ALJ in their particular case elected to believe one expert who opines the child was not substantially mentally impaired as that expert understood the term.
This case provides a glaring example of this incoherence. Both the en banc majority and the dissent in our initial panel opinion correctly recognized that the evidence in the instant case was virtually identical to that involved in Florida Birth-Related Neurological Injury Comp. Ass'n v. Florida, Division of Admin. Hearings, 686 So.2d 1349 (Fla.1997) (Birnie decision) concerning substantial mental impairment. How the majority can suggest otherwise is beyond comprehension. The ALJ in Birnie found the child suffered a substantial mental impairment and the supreme court affirmed. The ALJ here, on strikingly similar evidence, found otherwise, and the dissent to the initial panel opinion and now the en banc majority believes this court has no option but to affirm, given that expert testimony was adduced that young Raven did not suffer a substantial mental impairment. Thus, similarly situated, seriously injured children are deemed to have entirely different remedies based entirely on the ALJ's decision of which expert witness' concept of substantial mental impairment to accept in the case before them. The majority of this court now places its imprimatur of approval on this system.
This court's en banc decision ignores the result in Birnie and then compounds the error by failing to articulate an adequate legal standard to assist ALJs in their analysis of the evidence of substantial mental impairment presented to them.
In Birnie, the ALJ found that, despite having normal intelligence test scores, the child could not communicate, attend school or otherwise learn and develop intellectually without substantial accommodations, and that the child's social and vocational development were impaired. In affirming the ALJ's conclusion that the child suffered a permanent and substantial mental impairment, the supreme court's opinion necessarily holds that such evidence constitutes a substantial mental impairment. To suggest, let alone hold, that another ALJ could come along, and on strikingly similar evidence conclude that no substantial mental impairment was established, and that this court is duty bound to affirm, seems incomprehensible. Yet that is precisely what has occurred. I instead believe we are duty bound to give Birnie a common sense reading and to apply the legal standard set out therein to this case.
Even if the en banc majority is unwilling to ascribe this precedential value to Birnie, it should, at the very least, offer a legal standard to ALJs charged with determining substantial mental impairment. The legislature's failure to define the term does not mean that there are no legal standards applicable to such a determination. Rather, this court must consider the objectives of NICA and adopt the commonly-accepted meaning of the term. The majority opinion fails to do so.
The initial panel opinion, consistent with Birnie, did exactly this, explaining that a substantial mental impairment exists where the child, despite normal intelligence scores, will experience abnormal difficulties in developing and using his or her cognitive abilities:
The final order in this case failed to include any justification for deviating *577 from the legal standard approved in the Birnie decision and is entirely inconsistent with the legislative intent to provide compensation to infants who suffer birth-related neurological injuries on a no-fault basis. The test for substantial mental impairment is not whether cognitive reduction exists, but rather whether substantial accommodations are required for the exercise of cognitive functions. Mental impairment, in its plain and simple meaning, exists where, as here, the child will experience abnormal difficulties in developing and using her cognitive abilities.
It is conceivable that one can have substantial physical impairment without any mental impairment such as a person paralyzed from the waist down. In our view, the substantial accommodations must relate to the development of one's cognitive functions and not simply accommodations for physical impairments. To conclude that Raven is not mentally impaired because she has some degree of cognitive ability is absurd. Mental impairment should not be limited to impairment of cognitive functioning as measured by intelligence tests.
Adventist Health System v. Florida Birth-Related Neurological Injury, 865 So.2d 561, 566, 2004 WL 19485, *15 (Fla. 5th DCA Jan. 2, 2004).
The initial panel opinion, when read together with Birnie, creates a workable framework for ALJs to apply in analyzing evidence of mental impairment. This framework is consistent with the purpose of NICA to provide a limited system of compensation irrespective of fault for those infants which suffer birth-related neurological injuries. § 766.301, Fla. Stat.[1] As Judge Altenbernd noted in Fluet:
The purpose of the statutory plan is to limit a participating physician's exposure to civil liability in cases where the doctor's professional involvement could make him or her a defendant in a lawsuit.
788 So.2d at 1012.
The Legislature has provided an exclusive no-fault benefit in lieu of the traditional common law tort remedy. It is not for this court to second guess the wisdom of this legislative decision, nor to thwart the purpose of the legislation. The majority opinion in this case ignores the ordinary meaning of mental impairment and thwarts the purpose of the Legislature.
*578 By failing to adopt a meaningful standard for "substantial mental impairment," the majority allows skillful lawyers and "expert" witnesses to make an end run around NICA by giving them free reign to convince an ALJ that an injured child is not eligible for NICA simply because the child has a "normal cognitive function." Then, at trial, surely as the sun will rise tomorrow, those lawyers will turn around and argue to a jury that the child's brain damage is severe and permanent in the sure hope of hitting the proverbial "home run" on pain and suffering damages. Such a result does not limit physicians' exposure to civil liability or ensure that their malpractice insurance premiums will be "stabilized or reduced."
In the instant case, the evidence is undisputed that Raven sustained severe and significant physical injuries due to oxygen deprivation at birth. She has cerebral palsy, is unable to walk or talk and has problems holding her head up and directing her eyes. She cannot crawl or even sit up without assistance, and cannot reach out and hold objects. She is unable to eat by mouth.
On the issue of mental impairment, both sides acknowledge that Raven's CAT scans and MRI clearly show that she sustained various severe and permanent injuries to her brain at birth, including both sides of the basal ganglia and thalamus. There is also damage to the white matter surrounding the basal ganglia, the hippocampi, both frontal lobes, both parietal lobes, the corpus callosum and the cerebral cortex. All the witnesses agreed that these catastrophic injuries have the potential for far-reaching, permanent brain damage.
The only testimony that Raven is not mentally impaired is the opinion testimony of Dr. Brunstrom that Raven is of normal intelligence. That conclusion is in dispute on this issue but we are bound to accept the findings of fact of the ALJ that Raven is of normal intelligence.[2]
Based upon Dr. Brunstrom's conclusion that Raven has normal intelligence, the ALJ found that Raven is educable and can function in a school environment with "adaptive technology and assistance." As a matter of law, the ALJ erred because he failed to take into account the reality that Raven will experience abnormal difficulties in developing and using her cognitive abilities.
The initial panel opinion likewise does not stand for the proposition that a child with substantial physical disabilities automatically possesses the mental impairment required by the statute. Indeed, the opinion expressly recognizes that a child can have a substantial physical impairment without having a substantial mental impairment.
Our initial panel opinion and the Birnie decision provide a solid framework for analyzing the concept of "permanent and substantial mental impairment." The test for substantial mental impairment is not whether any cognitive ability exists, but rather whether substantial accommodations are required for the exercise of cognitive functions. Mental impairment exists when a child will experience abnormal difficulties in developing and using his or her cognitive abilities. The substantial accommodations must relate to the development of one's cognitive function, and not to accommodations for physical impairment. This is a reasonable test and one which conforms with both the clear language of the statute and the announced intent of the Legislature.
*579 Conversely, the ALJ's analysis in this case and the majority opinion offer no real guidelines and suggest that the determination of substantial mental impairment is solely dependent on I.Q. or "cognitive ability." This is an absurd result. Today's en banc decision purports to give effect to the well-settled rule of statutory construction that courts should rely on the common meaning of terms used but not defined by the Legislature. In reality, however, it does just the opposite. If this principle were truly applied, the common meaning of "substantial mental impairment" would be offered.
For instance, "mental" may be defined as "of or relating to the total emotional and intellectual response of an individual to his environment." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, p. 742 (1989). The term "impairment" means "to damage or make worse by or as if by diminishing in some material respect." Id. p. 603. The common meaning of these terms contemplates that substantial mental impairment exists where a person's emotional and intellectual response to his or her environment is diminished in a material respect. Where, as here, substantial accommodations are necessary before a person can exercise their cognitive functions, a substantial mental impairment exists.
The majority's effort to equate the result of this case to that of a civil jury trial where different juries may reach different results on similar facts omits a critical consideration:the fact finder reaches its decision after being instructed on the applicable law which is uniform throughout the jurisdiction. In this case, the ALJ applied his own definition of the statutory term "substantial mental impairment," a definition at odds with logic, the intent behind the Plan and the decision in Birnie.
Factually similar cases should result in similar results where there is no justification for deviating from a rule of law which was adopted with reasoned consideration. Reliance on prior decisions is an essential part of the judicial system. At the very least, this court should certify as a question of great public importance whether the supreme court in Birnie established a legal standard applicable in analyzing whether a substantial mental impairment exists.
It is difficult to overstate the deleterious effect of the en banc decision. Those sympathetic to a litigant's ability to pursue his or her common law remedies may applaud today's decision. However, what happens in the next case when we find ourselves duty-bound to affirm an ALJ who, in reliance on today's en banc decision, finds that a child who has suffered devastating brain damage identical to Raven's, but whose common law claims may be barred by the statute of limitations, is not within NICA because an expert witness says the child seems to be "cognitively intact"?
Let's turn the tables and consider another example. Assume no negligent act caused brain damage at birth. Raven desperately needs to participate in the Plan. NICA allows entry into the program on a no-fault basis so negligence is not an issue. By failing to announce any standard, today's en banc decision permits the ALJ to exclude the mentally impaired child with some cognitive function from participating in the Plan. This would leave Raven with no resources to treat her injuries.
SHARP, W., J., concurs.
NOTES
[1] Section 766.302(2), Florida Statutes (1995), in its entirety provides:

"Birth-related neurological injury" means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.
[2] The parties stipulated that Mrs. Shoaf was provided with notice of the plan by her obstetricians. The ALJ also found that proper notice was provided by the hospital.
[3] One witness described the difference in reference to New York City. Diffuse injuries occur when specific structures within the city of New York are destroyed, while global injury means all parts of the city sustain damage.
[4] Florida and Virginia appear to be the only two states which currently have such plans in place. In its original form, the Virginia statutes defined "birth-related neurological injury" to mean: "an injury that rendered the child nonambulatory, aphasic, incontinent, and in need of assistance in all phases of daily living." Gibson v. Riverside Hospital, Inc., 250 Va. 140, 458 S.E.2d 460, 462 (1995). The statute was amended in 1990, and again in 2003, to redefine a "birth-related neurological injury" to mean:

injury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled. In order to constitute a "birth-related neurological injury" within the meaning of this chapter, such disability shall cause the infant to be permanently in need of assistance in all activities of daily living.
Va.Code Ann. § 38.2-5001 (Michie 2003) (emphasis added).
[5] Appellees point out in their brief that Rule 4J 6.001(2)(f)2, Florida Administrative Code, promulgated by the Department of Insurance in June 2000 to govern the method and procedure the NICA medical advisory panel was to use in reviewing NICA claims, defined "substantial mental impairment" to be:

For a mental neurological impairment to be substantial, the infant must exhibit a severe mental impairment such that the infant has or would score, within a reasonable degree of medical probability, 50 or below on the mental component of the Bayley Scales of Infant Development (between 12-14 months) or the Stanford Binet Intelligence Test (between ages 4-5).
(emphasis added). Fla. Stat. § 766.308, which established and provided for the medical advisory panel, was part of the NICA statute until its repeal in July 2001.
[1] Section 766.302, Florida Statutes, refers to the Plan as established under section 766.303. The statutory provisions that I refer to are found in sections 766.301-.316, Florida Statutes (2002).
[2] The provisions of chapter 120, Florida Statutes, are made applicable by section 766.304, Florida Statutes, which provides:

The administrative law judge shall hear and determine all claims filed pursuant to ss. 766.301-766.316 and shall exercise the full power and authority granted to her or him in chapter 120, as necessary, to carry out the purposes of such sections. The administrative law judge has exclusive jurisdiction to determine whether a claim filed under this act is compensable.
[1] To quote Dickens' character, Mr. Bumble, commenting on the law: if that be the law, "the law is an ass-an idiot ..." Charles Dickens, Oliver Twist, Ch. 51.
[1] 766.301 Legislative findings and intent.

(1) The Legislature makes the following findings:
(a) Physicians practicing obstetrics are high-risk medical specialists for whom malpractice insurance premiums are very costly, and recent increases in such premiums have been greater for such physicians than for other physicians.
(b) Any birth other than a normal birth frequently leads to a claim against the attending physician; consequently, such physicians are among the physicians most severely affected by current medical malpractice problems.
(c) Because obstetric services are essential, it is incumbent upon the Legislature to provide a plan designed to result in the stabilization and reduction of malpractice insurance premiums for providers of such services in Florida.
(d) The costs of birth-related neurological injury claims are particularly high and warrant the establishment of a limited system of compensation irrespective of fault. The issue of whether such claims are covered by this act must be determined exclusively in an administrative hearing.
(2) It is the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation. This plan shall apply only to birth-related neurological injuries.
[2] Dr. Duchowny testified Raven was mentally and physically impaired. Dr. Waters testified that Raven's cognitive deficit was "significantly large" or substantial.