[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 13, 2010
JOHN LEY
CLERK

No. 09-14669
Non-Argument Calendar
_____

D. C. Docket No. 08-00608-CV-J-25-JRK

JAMES SHAW,
CAROL SHAW,

Plaintiffs-Appellants,

versus

NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA,
a foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 13, 2010)

Before CARNES, MARCUS and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

James Shaw broke both legs and his back, shattered his ankles, and lost one-third of his right heel when he fell from the roof of a building. Because he could no longer work, Shaw submitted a claim to National Union Fire Insurance Company for "permanent total disability" benefits under an insurance policy issued in Florida the previous year. After National Union denied Shaw's claim, he sued, and National Union removed the case to federal court.[1] The question before us is whether the policy's definition of *permanent total disability* unambiguously made dismemberment, blindness, or paralysis a condition of Shaw's eligibility for benefits.

## I

The question here turns on the meaning of the word *and* in two riders to Shaw's insurance policy, which promised him monthly and lump-sum benefits if he became "permanently totally disabled." The riders define that condition in substantively identical ways, and we reproduce the lump-sum rider's definition in its entirety here:

> Permanently Totally Disabled/Permanent Total Disability as used in this rider means:

---

[1] *See* 28 U.S.C. §§ 1332(a), 1441(a).

2

1. That the Insured has suffered any of the following:

   a. loss of both hands or feet; or
   b. loss of one hand and one foot; or
   c. loss of sight in both eyes; or
   d. Hemiplegia;or; or [sic]
   e. Paraplegia; or
   f. Quadriplegia

   "Loss of a hand or foot" means complete severance through or above the wrist or ankle joint. "Loss of sight in both eyes" means total and irrecoverable loss of the entire sight in both eyes.

   "Hemiplegia" means the complete and irreversible paralysis of the upper and lower Limbs of the same side of the body. "Limb(s)" means entire arm or entire leg. "Paraplegia" means the complete and irreversible paralysis of both lower Limbs. "Quadriplegia" means the complete and irreversible paralysis of both upper and both lower Limbs.

   and

2. the Insured is permanently unable to perform the material and substantial duties of any occupation for which he or she is qualified by reason of education, experience or training. However, with respect to an Insured for whom an occupational definition of Permanently Totally Disabled/Permanent Total Disability is not appropriate, Permanently Totally Disabled/Permanent Total Disability means, as used in this Rider, that the Insured is permanently unable to engage in any of the usual activities of a person of like age and sex whose health is comparable to that of the Insured immediately prior to the accident; and

3. the Insured is under the supervision of a Physician unless the Insured has reached his or her maximum point of recovery.[2]

The *and* that matters here is the one between numbered paragraphs 1 and 2. Shaw argues that the riders' punctuation, spacing, and context support a "disjunctive" or "cumulative" reading of that *and*. In other words, Shaw argues that he was entitled to benefits as long as he satisfied the conditions in *either* paragraph 1 *or* paragraphs 2 and 3. By contrast, National Union contends that the *and* must be read "conjunctively"—in other words, that the policy required Shaw to satisfy the conditions in all three numbered paragraphs. Because Shaw concedes that he suffered none of the injuries listed in paragraph 1, National Union argues that he is ineligible for the policy's disability benefits.

The district court rejected Shaw's interpretation of the policy language as "strain[ed]" and granted National Union's motion for summary judgment.[3] Shaw appeals, arguing that the district court should have construed the policy in favor of

---

[2] The monthly-benefit rider's definition of *permanent total disability* differs from that of the lump-sum rider in three minor ways. First, the monthly rider does not contain the lump-sum rider's typographical errors (";or; or") in paragraph 1(d). Second, the monthly-benefit rider lacks a period at the end of the last sentence in paragraph 1 (following "Limbs"). Finally, the monthly rider lacks the additional carriage return before the *and* separating paragraphs 1 and 2.

[3] In addition to the district court in this case, federal district courts in Texas and Wisconsin have concluded that similar definitions of *permanent total disability* require an insured to satisfy the conditions in all three paragraphs. *Tolbert v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 3:08-CV-1112-N (N.D. Tex. June 24, 2009) (unpublished); *Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 509 F. Supp. 2d 752 (W.D. Wisc. 2007).

4

coverage because it was ambiguous. We review the district court's summary judgment *de novo* and interpret the terms of Shaw's insurance policy according to Florida law. *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004).

## II

"Under Florida law, insurance contracts are construed according to their plain meaning. Ambiguities are construed against the insurer and in favor of coverage." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). But a policy provision is ambiguous only if "susceptible to more than one reasonable interpretation, one providing coverage and the []other limiting coverage." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). And "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Id.*

We initially note that National Union's interpretation of the policy is a reasonable one. Shaw argues that the riders' suggestion, in paragraph 2, that "an occupational definition" of *permanent total disability* may not always be "appropriate" implies that paragraph 1 contains its own, stand-alone definition of the term. Accordingly, Shaw contends that having satisfied the conditions of paragraphs 2 and 3, he is eligible for benefits without meeting the stand-alone

5

requirements of paragraph 1. But the plain language of paragraph 2 draws a distinction between "an occupational definition" and a "usual activities" definition of *permanent total disability*—not a distinction between paragraphs 1 and 2.[4]

Shaw also argues that National Union's interpretation would conflict with the monthly rider's provision for the cessation of benefits payments if "the Insured ceases to be Permanently Totally Disabled."[5] According to Shaw, because an insured could never cease to be irrevocably blind, irreversibly paralyzed, or an amputee, reading the conditions in all three numbered paragraphs as joint prerequisites to benefits eligibility would render the cessation provision superfluous. But despite the semantic awkwardness of the phrase "ceas[ing] to be *Permanently* Totally Disabled" (emphasis added), we find Shaw's argument on this point unpersuasive. Under National Union's interpretation of the policy, an insured must satisfy the requirements of all three paragraphs, and although a "permanently totally disabled" insured could never regrow a lost arm, he could, in theory, regain the ability to work.

---

[4] See either rider at paragraph 2: "[W]ith respect to an Insured for whom an occupational definition . . . is not appropriate, Permanently Totally Disabled/Permanent Total Disability means . . . that the Insured is permanently unable to engage in any of the usual activities of a person of like age and sex . . . ."

[5] The text of the relevant provision reads: "The benefit is payable monthly as long as the Insured remains continuously Permanently Totally Disabled due to that Injury, but ceases on the earliest of: (1) the date the Insured ceases to be Permanently Totally Disabled . . . ."

Our task, then, is to decide whether the *and* in question, read properly in the context of the policy as a whole, is susceptible to more than one reasonable interpretation. In short, can the *and* between paragraphs 1 and 2 reasonably be read in a way that allows Shaw to qualify for benefits without being blind, dismembered, or paralyzed?

## III

The parties' dispute here highlights a recurring problem: "[*E*]*very* use of 'and' or 'or' as a conjunction involves *some* risk of ambiguity." Maurice B. Kirk, *Legal Drafting: The Ambiguity of "And" and "Or"*, 2 Tex. Tech. L. Rev. 235, 253 (1971). As we have recognized in our cases, "[i]t is an established princip[le] that 'the word "or" is frequently construed to mean "and," and *vice versa*, in order to carry out the evident intent of the parties.'" *Noell v. Am. Design, Inc.*, 764 F.2d 827, 833 (11th Cir. 1985) (quoting *Dumont v. United States*, 98 U.S. 142, 143 (1878)).[6] In other words, "there is more to 'and' than meets the eye." *OfficeMax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005).

_____

[6] Not all observers have celebrated the frequency of this principle's application. *See MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 746 (9th Cir. 1988) (Kozinski, J., dissenting) ("As a linguistic matter, 'and' and 'or' are not synonyms; indeed, they are more nearly antonyms. One need only start the day with a breakfast of ham or eggs to be duly impressed by the difference. While 'and' and 'or' are both small words, and are occasionally seen joined with a slash, when they stand alone, they have substantially different meanings with dramatically different effects. We give our language, and our language-dependent legal system, a body blow when we hold that it is reasonable to read 'or' for 'and.'").

The problem with *and* is that "chameleonlike, it takes its color from its surroundings." *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958).[7] Specifically, it can be used either "jointly" (*e.g.*, "[both] A and B") or "severally" (*e.g.*, "A and B [meaning A or B, or both]").[8] Kirk, *supra*, at 238 (citing Reed Dickerson, *The Fundamentals of Legal Drafting* 77 (1965)). For example, when a person speaks broadly of "charitable and educational institutions," does she use *and* jointly ("conjunctively" in National Union's words)—to refer to individual institutions that are both charitable and educational—or severally ("disjunctively" or "cumulatively" in Shaw's words)—to refer to all institutions that are either charitable or educational, but may also be both? *See id.* at 238–40.[9] That people sometimes use *and* to connect

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), we adopted the decisions of the former Fifth Circuit as binding precedent.

[8] The corresponding difficulty with *or* is that it can be used in both an "inclusive" sense ("A or B [or both]") and an "exclusive" sense ("A or B [but not both]"). Kirk, *supra*, at 237–38. Compare the phrase, "if you are a husband or a father, you'll understand," with, "you may eat an apple or an orange." In the first example, the *or* is probably inclusive (people who are both husbands and fathers will probably understand, too), but in the second, it is probably exclusive (you are probably not allowed to eat both fruits). Note that the inclusive sense of *or* overlaps with the several sense of *and*.

[9] We eschew the parties' conjunctive–disjunctive dichotomy because of its potential to mislead. The word *and* always serves some "conjunctive" function; the question in a particular context is what other words the *and* is connecting, and how. *Cf. OfficeMax*, 428 F.3d at 600 (Rogers, J., dissenting) ("In each sentence the word 'and' has the same *conjunctive* meaning—the difference lies in whether the preceding words are distributed over the conjoined elements or not.").

mutually exclusive concepts, as in the phrase, "medical and burial expenses," *cf. id.* at 238, only increases the potential for confusion.

Yet the potential for confusion does not mean that every occurrence of the word *and* is ambiguous. On the contrary, the context in which the word appears often resolves any superficial uncertainty. In the phrase, "medical and burial expenses," for example, *and* is necessarily used severally: because no single expense can be both "medical" and "burial," interpreting *and* jointly would make no sense.

The general rule in this circuit—and in Florida—is that "unless the context dictates otherwise, the word 'and' is presumed to be used in its ordinary sense, that is, [jointly]." *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1332 (11th Cir. 2005) (citing *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)); *see also Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings*, 686 So. 2d 1349, 1355 (Fla. 1997) (noting that courts may read *and* severally "where legislative intent mandates it" to avoid "unreasonable, absurd results"). Thus, in cases where we have read *and* severally, the context fairly could be said to have compelled that result. For instance, in *Noell v. American Design*, we considered two retirement plans under which an employee forfeited his accrued benefits "if he compete[d] with the Employer . . . ; if he [was] determined . . . to

9

have been guilty of committing theft, fraud or embezzlement . . . ; *and* if he [was] determined . . . to have disclosed or released to third parties the Employer's trade secrets." 764 F.2d at 829 (emphasis added). After considering the circumstances and the plan summaries provided to the employees, we held that the word *and* had to be read severally to effect the parties' intent:

> For the forfeiture clause to have meaning [if *and* were read jointly], an employee would first have to be guilty of theft, fraud or embezzlement, he would then have to disclose or release to third parties the employer's trade secrets, and then he would have to go to work for a competitor. It would be unreasonable to conclude that an employer, who has provided its employees with benefits in excess of those required by law, would place such an onerous burden on itself with respect to the termination of the benefits.

*Id.* at 833. Similarly, in *Peacock v. Lubbock Compress Co.*, 252 F.2d at 893, we held that a several reading of the word *and* in the statutory phrase, "the ginning and compressing of cotton," was the only one that made any sense: "[I]t is an acknowledged undisputed fact of the cotton industry that compressing is an operation entirely removed from ginning and that the two are never carried on together. To read [the phrase] literally [*i.e.*, jointly] here is to read it out of the statute."

We reached the opposite conclusion in *American Bankers*, 408 F.3d 1328. There we interpreted a statute that defined *toll telephone service* as a service for

10

which the charge "varie[d] in amount with the distance and elapsed transmission time of each individual communication." 26 U.S.C. § 4252(b)(1). Without evidence supporting a several reading, we read the *and* jointly: "[T]he provision requires that to come within the definition of 'toll telephone service' the rate must vary by *both* 'distance and elapsed transmission time.'" 408 F.3d at 1334; *accord OfficeMax*, 428 F.3d 583.

In light of these authorities, we agree with National Union that the *and* in this case must be read jointly: Shaw cannot be "permanently totally disabled" without suffering one of the injuries listed in paragraph 1. Despite Shaw's arguments regarding syntax and punctuation, we cannot say the context here "dictates" a several reading of *and*. *Am. Bankers*, 408 F.3d at 1332.

We find each of Shaw's arguments against this conclusion unavailing. First, he argues that the period at the end of paragraph 1 in the lump-sum rider "establishes the disjunction between Paragraphs 1 and 2." But paragraph 1 contains a series of sentences separated by periods, and we do not believe that the inclusion of a similar period at the close of the paragraph's final sentence effects a "disjunctive" break. In addition, because the final period does not appear in the monthly-benefit rider, Shaw's reading would have the two riders apply in different contexts. We will not assume from minor inconsistencies in punctuation that the

11

parties intended two materially identical provisions of the same insurance policy to apply at different times.

Shaw's second argument is that we implicitly held in *American Bankers* that the *and* separating two paragraphs in 26 U.S.C. § 4252(b) had a several meaning. The factual premise of this argument is correct, but the inference Shaw draws is not. Section 4252(b) defines *toll telephone service* as (1) a service for which the charge "varies in amount with the distance and elapsed transmission time of each individual communication . . . and" (2) a service with a flat, periodic charge for unlimited calls. Because the *and* between subsections (1) and (2) connects two mutually exclusive concepts, we had to read it severally. *See OfficeMax*, 428 F.3d at 591. By contrast, where the word has a natural and defensible joint reading—as in the phrase, "varies in amount with the distance and elapsed transmission time"—we read it jointly.

Finally, Shaw argues that a joint reading of the *and* between paragraphs 1 and 2 would render National Union's policy inconsistent with "standard" disability-insurance policies. But this is a red herring; the parties to an agreement are bound by the contract into which they enter, not according to the contractual obligations of others. Although Florida law permits us to "consider established

custom and usage in the insurance industry," *Auto-Owners*, 756 So. 2d at 36, we

will not make the parties to one contract abide by the terms of another.[10]

Because Shaw has not suffered the dismemberment, blindness, or paralysis

unambiguously required by his disability-insurance policy, we **AFFIRM** the

summary judgment in National Union's favor.

---

[10] The dispute in the *Auto-Owners* case concerned the scope of a limitation-of-liability clause. The Florida Supreme Court held that the clause was ambiguous, in part because other insurance policies contained different clauses that "clearly and unambiguously" limited insurer liability. 756 So. 2d at 36. Here, no evidence suggests that other insurers customarily define *permanent total disability* in a way that would more "clearly" effect National Union's interpretation of the policy. On the contrary, if the parties had intended Shaw's reading of the policy, they could have used the broader term *total disability*. *See* Fla. Stat. § 627.4233 ("[T]he definition of total disability may not be more restrictive than the person's inability to perform any work or occupation for which the person is reasonably qualified or trained.")